**FEDERAL CRUDE OIL CO. v. YOUNT–LEE OIL CO. et al.**

No. 2591.

Court of Civil Appeals of Texas. Beaumont.
June 20, 1934.

Rehearing Denied June 30, 1934.

970

COMBS, Justice.

On January 12, 1928, appellant, Federal Crude Oil Company, instituted this suit in the Sixtieth district court of Jefferson county against appellees, Yount-Lee Oil Company, a corporation, and B. E. Quinn, as an action in trespass to try title and to recover the value of oil which had been extracted by appellees from the land in controversy, aggregating in value more than $12,000,000. The land in controversy is 13.8 acres, being lots 5 and 7 out of the Chaison-Hebert subdivision in the John Douthitt survey in Jefferson county.

Appellant was duly chartered as a corporation for the purpose of drilling for and producing oil on April 24, 1901, with a capital stock of $450,000, divided into 1,500,000 shares. It acquired fee-simple title to the land in controversy in 1901 for a consideration of $140,000, and proceeded to drill a well for oil on lot 5 to a depth of 2,300 feet. Oil was not found in this well. In 1903 or 1904 appellant ceased to function as a corporation and abandoned its business, but all its debts were paid except the state and county taxes, which were not paid for the year 1903 and the subsequent years; also the state franchise tax was not paid, and on July 1, 1905, its right to do business was forfeited by the secretary of state, and due entry thereof made upon the proper records in the manner required by law. No steps were taken to renew its franchise until June 5, 1928, when appellant paid to the secretary of state the sum of $10,-500, being the full amount of its delinquent franchise tax up to that date with interest and costs, whereupon the secretary of state issued to it a certificate reciting such payment and that its corporate powers to sue and defend had been restored to it. It then instituted this suit.

Upon the first call of the case for trial the trial court sustained defendants' plea in abatement, which challenged appellant's right to maintain the suit holding in effect that payment of the delinquent franchise tax did not revive its right to sue and defend suits, because not paid within six months after its right to do business was forfeited. From the judgment sustaining the plea in abatement an appeal was prosecuted to this court, and the Supreme Court held, by opinion filed the 20th day of June, 1932, answering questions duly certified to it from this court, that the payment of the delinquent franchise tax by appellant and the issuance to it by the secretary of state of the certificate certifying such payment restored to it its original cor-

Nelson Phillips, of Dallas, and W. D. Gordon, E. E. Easterling, and S. H. German, all of Houston, for appellant.

Beeman Strong and Orgain, Carroll & Bell, all of Beaumont, F. A. Williams, of Galveston, R. L. Batts, of Austin, S. M. King, of Beaumont, and R. A. Shivers, of Port Arthur, for appellees.

porate right to sue and to defend actions brought against it. See Federal Crude Oil Co. v. Yount-Lee Oil Co., 122 Tex. 21, 52 S.W.(2d) 56. After the return to the lower court of the mandate from this court reversing the judgment of the lower court and remanding the cause for a new trial [see opinions of this court, Federal Crude Oil Co. v. Yount-Lee Oil Co., 53 S.W.(2d) 1119; Federal Crude Oil Co. v. Quinn, 53 S.W.(2d) 1119], appellees filed their first amended original answer, upon which they went to trial. The answer consisted of the general demurrer, plea of not guilty, special pleas of the several statutes of limitation, and a plea that certain proceedings theretofore had involving the title and possession of the land now in controversy were stare decisis and res judicata of the title in favor of appellees against all claims asserted by appellant. Appellee Yount-Lee Oil Company claimed title to lot 5, containing 6.9 acres, and appellee Quinn claimed title to lot 7, containing 6.9 acres. The issue of limitation, as it related only to lot 5, was submitted to the jury by the following questions, and answered as indicated:

(1) "Do you find from the preponderance of the evidence that the boarded-up pit on Lot 5 is a pit used by Chenault, the Nearens, Cruse, Blanchette and the Wilkersons in the operation of the waste oil business conducted by them?" The answer to that question was "Yes."

(2) "Do you find from the preponderance of the evidence that the cypress tanks used by Chenault, the Nearens, Cruse, Blanchette and the Wilkersons in the waste oil business conducted by them were on Lot 5?" The answer to that question was "Yes."

(3) "Do you find from the preponderance of the evidence in this case that the defendant, Yount-Lee Oil Company and those under whom it claims, prior to the 12th day of June, 1928, have been in peaceable and adverse possession of Lot 5 of the Chaison Subdivision of the Douthitt Survey and described in plaintiff's petition, using or enjoying the same for a period of ten consecutive years, exclusive of the one hundred sixty-five days M. F. Yount was absent from the state?" The answer to that question was "Yes."

(4) "Do you find from the preponderance of the evidence in this case that the defendant, Yount-Lee Oil Company, and those under whom it claims, subsequent to January 1, 1923, and prior to the 12th day of June, 1928, has been in peaceable and adverse possession of Lot 5 of the Chaison Subdivision of the Douthitt Survey described in plaintiff's petition, using or enjoying the same and paying all taxes thereon and claiming under a deed or deeds duly registered for a term of five years, exclusive of the thirty-seven days M. F. Yount was absent from the state in 1923?" The answer to that question was "Yes."

No other issues were submitted to the jury.

On the verdict of the jury and the undisputed evidence, which the trial court construed as sustaining the pleas of stare decisis and res judicata, judgment was entered against appellant that it "take nothing in this suit against the defendant Yount-Lee Oil Company, or the defendant B. E. Quinn, or either of them, and that the defendants recover of the plaintiff, Federal Crude Oil Company, all costs in this behalf expended, for which they may have their execution." From that judgment the plaintiff, Federal Crude Oil Company, has duly prosecuted its appeal to this court.

This case has been extensively and ably briefed on both sides. So many propositions of law have been advanced which merit consideration that a discussion of them, with the recital of the essential facts necessary to an understanding of the points involved, make it next to impossible to confine this opinion within reasonable length. It may be helpful to state in the outset that, except for certain assignments complaining of the admission of evidence and of the court's charge, there are basically only two issues involved. One is the issue of limitation, which applies only to lot 5, claimed by the appellee Yount-Lee Oil Company; and the other, which affects title to both tracts, involves the question of whether appellees have acquired appellant's title by virtue of a receiver's sale to J. F. Guilmartin in 1908, in a receivership then pending in the Fifty-Eighth district court of Jefferson county. The latter issue involves an attack on the validity of the receivership sale, and also the questions of stare decisis, res judicata, and innocent purchaser pleaded as defenses by appellees.

The following preliminary statement is necessary to an understanding of appellant's propositions: On the 26th day of September, 1907, after appellant's right to do business had been forfeited on July 1, 1905, J. F. Guilmartin, one of its stockholders, filed suit in the district court of Jefferson county, being cause No. 6398 on the docket of the Fifty-Eighth district court, styled J. F. Guilmartin v. Federal Crude Oil Company, alleging that the defendant's right to do business had been forfeited, with prayer for the appointment of a receiver to take charge of and dispose of its properties. On October 7, 1907, the applica-

tion for receiver was heard and granted and C. L. Rutt was duly appointed receiver. On December 11, 1907, the receiver filed his report that he could sell the property of appellant, which consisted only of the land now in controversy and of one other small tract, to J. F. Guilmartin for $50, subject to all outstanding liens, which were for the taxes, upon which suit had been filed. According to recitals in the judgment, the case thereupon proceeded to trial upon its merits, and judgment was entered directing the receiver to sell the land to Guilmartin on the terms stated in his report. Under this order the receiver conveyed the land to Guilmartin for the consideration and upon the terms stated in the report, which deed was placed of record on January 23, 1908. On the 22d day of January, 1908, Guilmartin, for the consideration of $60, by warranty deed sold lot 7 of the land in controversy to R. W. Wilson. The Wilson title, through a series of several deeds, passed to appellee B. E. Quinn, by deed dated the 17th day of October, 1917. Quinn purchased the land in good faith on the advice of his attorneys that he was acquiring a good title, and paid therefor $700. On February 13, 1917, M. F. Yount, for appellee Yount-Lee Oil Company, purchased lot 5 of the land in controversy from J. F. Guilmartin for a consideration of $690. He purchased the land in good faith on the advice of his attorneys, believing he was acquiring a good title thereto. When Quinn and Yount purchased the land, they paid its full value as of the date of their respective purchases. The increase in value from 1907 to the dates when Quinn and Yount purchased was occasioned by the development for oil in the Gulf Coast territory. The title thus acquired by appellees was the record title asserted by them upon the trial of this cause in defense of appellant's action in trespass to try title. In addition, appellee Yount-Lee Oil Company also pleaded limitation title to lot 5 claimed by it.

Following the order in which appellant has briefed the issues, we shall first consider its assignments against the issue of limitation. The claim of limitation is based on the use of lot 5 by persons engaged in picking up or "trapping" waste oil from the Spindletop oil field from 1908 until the Yount-Lee Oil Company went into possession in 1926 and began drilling operations, and from that time until the suit was filed in 1928 it held the possession. A pick-up station, consisting of a waste oil pit, storage tank, oil treating tank, steam boiler, hand pump, and certain piping used in connection with the salvaging and marketing of waste oil were placed on the lot in 1908 and

continuously used thereafter until Yount-Lee Oil Company moved them off to make room for its drilling operations. Appellee Yount-Lee Oil Company contends that the various persons operating the waste oil station were in possession of the lot by permission and as tenants first of Guilmartin, during the time he claimed it, and then occupied it as tenants of Yount-Lee Oil Company from the time Guilmartin conveyed it to M. F. Yount in 1917.

Appellant insists that the record does not support the issues of limitation found against it by the jury for the following reasons:

(a) The persons whose possession is relied upon were receivers appointed by the court to salvage and prevent the escape of waste oil, that they acted as officers of the court, and their holding could not have been adverse.

(b) Appellant having been all during the claimed limitation period denied the right to sue for recovery of the land by reason of the forfeiture of its right by the secretary of state, limitation would not run against it.

(c) The character and amount of the improvements placed on the land and the character of the use was not sufficient, as a matter of law, to visit appellant with notice of an adverse claim.

(d) There is no evidence that the persons in possession held as tenants of either Guilmartin or Yount.

(e) That both Guilmartin and Yount occupied a fiduciary relationship to appellant as to the land in controversy, which was never repudiated.

(f) That the improvements shown to have been made by the operators of the waste oil station were mere encroachments over the line of an adjoining tract on which they held a lease.

We will discuss these propositions in order.

■ (a) The undisputed facts are that the persons holding possession for Guilmartin, Yount, and Yount-Lee Oil Company were receivers duly appointed by the district court of Jefferson county in the case of Geo. W. Carroll v. J. M. Guffey Petroleum Company, under orders directing them and each of them from the date of their respective appointments to trap and recover, conserve, and sell, the waste oil flowing from the Spindletop oil field; each receiver gave a bond in the sum of $500 to secure the faithful performance of his duties as such receiver. On this statement appellant advances the following proposition: "Receivers operating under orders of the court to empound waste oil flowing

from the Spindletop Oil Field, being agents of the court, could not as matter of law in the use claimed to have been made of a pit and tanks in the edge of Lot 5 constitute the possession, use, occupation and hostile claim adverse to the true owner as would support title under the statutes of limitations in favor of a trespasser asserting an adverse claim to the rightful owner of the land."

This proposition, even if sound as a general statement of the law, has no application to the facts of this case. The Carroll Case was a suit to prevent pollution of streams by waste oil. The "receivers" so called were appointed for the sole purpose of trapping and preventing the escape of waste oil from the Spindletop oil field. The court first appointed Clint Chenault and J. M. Nearen receivers for the purpose stated, and they entered upon the discharge of their duties in the spring of 1908. Out of the proceeds of the sale of waste oil recovered they were to pay the expenses of operation and keep the balance as compensation for their services. The land involved here was not involved in the Carroll Case. In fact, that receivership did not extend to any land but only to the waste oil. The order of appointment gave the receivers no authority to take possession of anything except the waste oil. Under the receivership the court exercised no control whatever over the placing of the pick-up station, nor of the manner in which the receivers conducted the business of picking up the waste oil, nor with the sale of the oil. All equipment used by the receivers was owned by them individually. The receivers conducted the business in every respect as their own, not even making reports to the court that appointed them. Under their appointment they had no authority to interfere with one capturing waste oil on his own land, nor did they have any right to go upon the land of another for the purpose of capturing oil. And what has just been said with regard to the original receivers applies with equal force to their successors in office named in the special issues submitted to the jury. The receivers named in the issues held possession of lot 5 by permission of Guilmartin from 1908 until he sold in 1917, and by permission of M. F. Yount and Yount-Lee Oil Company from that date until they began drilling operations in 1926.

It follows that, since the receivers appointed in the Carroll Case never received from the court the possession or the authority to take possession of the land in controversy, this land was never in the custody of the court in that case, nor in the custody or possession of its receivers as such. Clearly, in entering upon and using this land as they did, the receivers were trespassers until they received authority, first from Guilmartin and afterwards from Yount, to hold and use it. Thus holding under Guilmartin and Yount, they were trespassers against appellant, if it was the true owner. In 34 Cyc. 190, it is said: "b. *Property not involved.* Property not involved in the suit, as property which is not embraced in the complainant's mortgage, nor protected from the remedies of other creditors by any contract or legal liens, is not properly in the hands of the receiver. He has no right to property which does not belong to those over whose estate he was appointed, at the time of the appointment, and if the receiver assumes to take property of one not a party to the record under an appointment over the property of a party to the record he will be a trespasser."

In 53 C. J. p. 95, § 118, p. 98, § 122, it is said:

"*Custody of Court.* As a general rule it may be stated that property in the possession of a receiver is in custodia legis; that the receiver's possession is the possession of the court for the benefit of the party or parties ultimately entitled, nor is such legal custody altered by the removal of the receiver and the appointment of another in his place. But this rule applies only where the receiver's possession is a lawful possession under a lawful order of court, and only to property which the receiver was appointed to hold" Page 95.

"*Property and Rights Included.* 1. In General. Property not involved in the suit is not property in the hands of a receiver, and he has no right to property which does not belong to the person over whose estate he was appointed, or to property not mentioned in the petition for his appointment. And where the order of appointment designates the particular property of which the receiver is to have charge, other property is excluded."

The following authorities by the courts of this state satisfactorily support the general propositions announced by Cyc. and Corpus Juris: St. Louis, A. & T. Railway Co. v. Whitaker, 68 Tex. 636, 5 S. W. 448; City Water Co. v. State, 88 Tex. 603, 32 S. W. 1033; Farmers' & Merchants' Nat. Bank v. Scott, 19 Tex. Civ. App. 22, 45 S. W. 26, 28; Ray-Featherstone Oil Co. v. Phoenix Oil Co. (Tex. Civ. App.) 268 S. W. 1032.

Of the authorities cited by appellant in support of their proposition, only Coppard v. Stanush (Tex. Civ. App.) 258 S. W. 254, and Wilkinson v. Lehman-Durr Co., 136 Ala. 463, 34 So. 216, deal with the effect of the appointment of a receiver or trustee in bankruptcy upon the issue of adverse possession. In both

these cases the land in controversy was put into the hands of the receiver by the order of the court, which fact distinguishes them from this case, where no order of the court attempted to empound this land.

▮ (b) Appellant's second proposition is as follows: "The plaintiff, by statute, having been denied the right of action to sue for the recovery of its land during the entire period of the alleged adverse possession on the part of the trespasser, no right of action accrued against plaintiff under the asserted adverse possession. And being thus denied by law the right to sue, such trespassers could not, under the statutes of limitations, take from plaintiff its title to this land. And the judgment based on such ground denies to plaintiff due process of law guaranteed to it by Section I of the Fourteenth Amendment to the Constitution of the United States, and violates Section 19 of the Bill of Rights of Texas."

As already stated, appellant's right to do business was forfeited in 1905, and its right to prosecute suits was not restored to it until 1928. It was during that time that all of the possession upon which appellees base their claim of limitation to lot 5 was held. It is the statutory law of this state (article 5510, R. S. 1925) that one who has the right of action for the recovery of land against another, having peaceable and adverse possession thereof, must institute a suit therefor within ten years next after his cause of action shall have accrued and not afterwards. Construing this statute, our courts hold that the statutes of limitation begin to run only from the date of the accrual of the cause of action. Port Arthur Rice Mill Co. v. Beaumont Rice Mills, 105 Tex. 520, 143 S. W. 926, 148 S. W. 283, 150 S. W. 884, 152 S. W. 629; Stanley v. Schwalby, 85 Tex. 348, 19 S. W. 264; Lemp Brewing Co. v. La Rose, 20 Tex. Civ. App. 575, 50 S. W. 460; Davis v. Dixon, 61 Tex. 449; Life Ass'n v. Goode, 71 Tex. 90, 8 S. W. 639. But neither the authorities cited by appellant, nor any other authority that has come to our attention, support the proposition that, by refusing to pay its franchise tax, which resulted in the forfeiture of its right to sue from 1905 to 1928, appellant tolled the running of the statutes of limitation. We think it a sound proposition to say that a disability to sue, which is due wholly to the default of the person claiming its benefits and which at all times he had the power to remove, will not toll the running of the statutes of limitation. At any time during that period of time appellant had the right to revive its charter rights and resume all its corporate powers. See Federal Crude Oil Co. v. Yount-Lee Oil Co., supra. In Texas Jurisprudence, vol. 28, p. 140, § 56, "Limitation of Actions," it is said: "It has been decided, however, that where the right to sue is dependent upon the performance of a preliminary act by the plaintiff, the latter, if he has power to perform, may not indefinitely suspend the running of the statute by delaying performance of the preliminary act."

17 Ruling Case Law, p. 756, § 121, "Limitation of Actions," thus states the rule: "But when some preliminary action is an essential prerequisite to the bringing of a suit, and such action rests with the claimant, he cannot defeat the operation of the statute of limitations by a failure to act or by long and unnecessary delay in taking the antecedent step. It is not the policy of the law to permit a party against whom the statute runs to defeat its operation by neglecting to do an act which devolves upon him in order to perfect his remedy against another. If this were so, a party would have it in his own power to defeat the purpose of the statute in all cases of this character."

These general propositions have clear support in the following Texas cases: Gamble v. Martin, 60 Tex. Civ. App. 517, 129 S. W. 386; Smith v. Wise County (Tex. Civ. App.) 187 S. W. 705; Port Arthur Rice Mill Co. v. Beaumont Rice Mills, 105 Tex. 520, 143 S. W. 926, 148 S. W. 283, 150 S. W. 884, 152 S. W. 629.

▮ Moreover, during the time when the corporation was powerless to act, its stockholders, who were the beneficial owners of its property, were fully authorized to prosecute such suits as necessary to protect their property rights. Federal Crude Oil Co. v. Yount-Lee Oil Co., 122 Tex. 21, 52 S.W.(2d) 56; Fidelity Building & Loan Ass'n v. Thompson (Tex. Com. App.) 51 S.W.(2d) 578.

▮ Again, article 5518, R. S. 1925, specifies in detail the disabilities which prevent the running of the statutes of limitation. Since the disability now urged by appellant is not within the provisions of article 5518, the courts do not have the power to read into this article this new disability. In discussing the power of the courts to create exceptions, it is said in 17 R. C. L. 828: "As a general rule the courts are without power to read into the statute exceptions which have not been embodied therein, however reasonable they may seem. It is not for judicial tribunals to extend the law to all cases coming within the reason of it, so long as they are not within the letter. Considerations of apparent inconvenience or hardship will not be allowed to control. The enactment of the lawmaking power within its legitimate field must not be ob-

structed by the judicial administration. Such power is ample, if it sees fit, to extinguish any right enforceable by an action, if judicial remedies for such enforcement are not invoked within such reasonable time as it sees fit to name. The possession of the right may be under disability personally to enforce the same within the prescribed period by reason of infancy, insanity, imprisonment or other cause, and yet the statute in general terms, not containing any exception to save the right, will extinguish it."

In Tyson v. Britton, 6 Tex. 222, Judge Hemphill said: "The Legislature has prescribed a general rule (of limitation), with special disabilities or privileges; and these cannot be enlarged or extended to objects not embraced in the exception, by mere implication, or from parity of reason. For authorities, see 2 Pothier on Obligations, p. 97; [Doe v. Jones] 4 T. R. 300; [Smith v. Hill] 1 Wils. [K. B.] 134; Phillips' Digest, p. 402; [Grice v. Jones] 1 Stew. [Ala.] 254; [Johnson v. Wren] 3 Stew. [Ala.] 172."

To the same effect, see Texas & P. Railway Co. v. Ward County Irrigation District (Tex. Civ. App.) 257 S. W. 333; Snoddy v. Cage, 5 Tex. 106.

■■ (c) Appellant divides its third proposition into five sections. The first section is as follows:

"As a matter of law there is no evidence in the record to sustain the pleas of limitations upon the following grounds:

"First: The evidence is insufficient to establish the appropriation and use of the land in controversy, or any part thereof, and hostile claim thereto, to charge the true owner, Federal Crude Oil Company, with notice of adverse possession, use or enjoyment as required by the statute, there being no appropriation of the land or use thereof to which it was reasonably adapted."

The evidence was ample to raise an issue of fact for the jury that the appropriation and use of lot 5 by the tenants of Guilmartin, Yount, and Yount-Lee Oil Company constituted a hostile claim to the land and was of such nature as to apprise appellant of the adverse claim. In the first place lot 5 and adjoining territory was very low. Prior to the entry by Guilmartin's tenants in 1908, the surface of this lot had been damaged by overflow of salt water from the old Spindletop oil field, and it had practically no value for agricultural purposes. It was located near the then producing area of the Spindletop oil field, and the principal use for which it was adapted was for tankage, storage, and uses of similar character incidental to oil production. As already stated, the original entry was late in the spring of 1908 by Chenault and Nearen, working as partners under the orders of the court making their appointment as receivers. They owned one acre immediately adjoining lot 5 on the south, which they had planned to use in their operations. They began the construction of a pit for this purpose, thinking it was on their acre, but during the time of its construction and before it was completed they learned it was on lot 5. And before it was completed they discovered its claim by Guilmartin, and rented lot 5 from Guilmartin's agent on the basis of a yearly rent of $20, which sum was paid to the agent. After thus renting lot 5 they proceeded to finish the construction of their pit, which was 14 or 15 feet wide, 35 feet long, and 5 feet deep. After the excavation, the sides of the pit were walled up with planks. There was a natural drain or slough crossing under the railroad east of lot 6 and running in a southwest direction across lot 6 onto lot 5, which drained west of Spindletop. Chenault and Nearen changed the ditch slightly to the north, and the same was dug deep enough to make a drain about 4 feet wide and a foot or more deep. Out of this main ditch was dug a side ditch, leading into the waste oil pit, and a board was placed across the main ditch so as to operate as a sort of dam to raise the water flowing down the ditch, thus causing the waste oil on top to rise and run out of the main ditch into the side ditch and then into the waste oil pit. This trap, or dam, was upon the acre owned by Chenault and Nearen, but all other improvements used by them were on lot 5. In addition to the waste oil pit, as a part of the equipment of the oil station, and for storing the waste oil, Chenault placed upon lot 5 a boiler, storage, and fuel tanks, a pump, and piping used in operating the business. The pit was about 15 feet from the south line of lot 5. The boiler, 25 horse power, about 12 feet in length, with a fire box about 36 inches long, was located a short distance northeast of the pit. The boiler was set up on the ground with a piece of pipe underneath the fire box, and then built up with blocks back under the end of the boiler and with a smokestack. The pumps were set between the boiler and the pit, close up to the pit. A wooden cypress tank was placed on lot 5 about 40 feet northwest of the pit. This tank was about 12 or 14 feet in diameter and about 14 or 15 feet in height, with a capacity of about 250 barrels. Chenault and Nearen

were on lot 5 in the operation of their station and in treating and pumping the oil every day and sometimes all day long. At that time there was considerable waste oil in and about Spindletop, and Chenault and Nearen would some time run as much as thirty-two 250-barrel tanks in thirty days, working at their station every day. Chenault sold out his interest in the enterprise to his partner, Nearen, in the latter part of 1908. After Chenault sold out to Nearen, he caused the pit to be enlarged and continued to operate it until his death in 1909. After Jim Nearen bought from his partner, Chenault, his brother, W. S. Nearen, was employed to operate the station. While he was working there in 1909, the pit was enlarged and the walls were improved to the extent of completely boarding them up. The pit was dug about 4 feet into the ground and had dirt thrown up around it to a height of about 5 feet. After the death of his brother Jim in July, 1909, W. S. Nearen operated the plant until he bought it from Jim Nearen's widow, in October, 1909. When W. S. Nearen began working for his brother in 1908, the improvements on lot 5 consisted of the waste oil pit, the 250-barrel cypress tank and another smaller cypress tank, a small fuel tank, a 25 horse power boiler and some pumps, a pile of junk pipe, a woodpile for firing the boiler, and an earthen water tank for boiler use. Similar improvements were maintained on lot 5 until appellee Yount-Lee Oil Company took possession of the lot a short while before this suit was filed for the purpose of drilling oil wells thereon. There were no boilers or pits upon the one acre above referred to. Only the dam or trap was maintained on that lot. After the purchase by W. S. Nearen from the widow of his brother, he operated the pick-up station continuously in the manner above stated until he sold out to Jack Cruse in the latter part of 1911. During that time he was on lot 5 every day, and would sometimes work there all day long. The wooden tanks above mentioned were in constant use for the purpose of storing oil. The earthen and boarded pit were used for catching oil and treating it and storing it until transferred to the wooden tank. The boiler was used for making steam for the purpose of operating the pump and treating the oil. Jack Cruse took possession of lot 5 and all improvements thereon immediately after his purchase from Nearen. In selling to Cruse, Nearen delivered all the equipment he had on lot 5 and all the rights he had to lot 5.

In 1909 W. L. Gober, through authority of W. S. Nearen, built on lot 5 a mule corral about 150 feet in width with a feedhouse and shed. He bored a well on lot 5 to secure water for the stock and maintained in his corral six head of stock most of the time for two years. Jack Cruse operated the pick-up station on lot 5 with the equipment he had purchased from W. S. Nearen until the early part of 1912, when he sold to Horace Blanchette. While he was there he put in a new boiler on the same location as the old boiler. The new boiler was about 14 feet long and about 5 feet high, exclusive of the dome. He put new coils in the pit for the purpose of treating the oil, which was done by steam. From the time Jack Cruse purchased until he sold to Blanchette he was on the lot two or three times a day. When Blanchette bought from Cruse, about the same improvements were on the lot as when Cruse bought from Nearen. Blanchette took immediate possession from Cruse, operating the pick-up plant very much as Cruse had operated it; Joe Myers was his agent for that purpose. Myers ran it several months for Blanchette, when he turned the plant over to a man named Wilkerson, who operated it for Blanchette. Wilkerson continued the operation of the plant for Blanchette until in 1919, when Blanchette sold the plant, equipment, and leases to Wilkerson. From the time Blanchette purchased in 1912 from Cruse until he sold to Wilkerson in 1919, the plant was continuously operated as Cruse and the Nearens had operated it. When he sold to Wilkerson he sold him all of the equipment and all of his rights and leases and turned over to Wilkerson the same tanks he purchased from Cruse. After Wilkerson purchased from Blanchette he continuously operated the pick-up station until his death in 1924 and during that time was on lot 5 nearly every day. During that time the equipment continued in the condition and in the amount very much as when he bought it from Wilkerson and as when Wilkerson bought it from Cruse. In the meantime, somewhere during the possession, another tank was placed on the lot with a capacity of from 60 to 100 barrels, which was used for storing oil. It was about 125 feet east of the large tank; also another tank was placed on lot 5 of about 40-barrel capacity, a little east and north of the 60-barrel tank. During the time Wilkerson operated the pick-up station on lot 5 he would bring onto lot 5 oil he had picked up from other places and store it in the tanks

on lot 5. Upon the death of Mr. Wilkerson in 1924, his son, Claude Wilkerson, who had assisted his father in the operation of the plant, took over the possession of his father and continued to operate the pick-up plant. Claude Wilkerson died in 1925, having continuously operated the plant until that time, and after his death Charlie Wilkerson, who had assisted Claude in the operation of the plant, without interruption, took over the operation and continued it until the time of the entry of Yount-Lee Oil Company in 1926. At the time he ceased operations, Yount-Lee Oil Company was building derricks on lot 5 and was commencing drilling operations. There was no lapse of time between Wilkerson's death and the time Claude Wilkerson took over operations and none between the death of Claude Wilkerson and the taking over of the operations by Charlie Wilkerson. The Yount-Lee Oil Company commenced the actual drilling of a well on lot 5 in July, 1926; it carried on continuous operations on lot 5 until the filing of this suit on July 28, 1928, at which time it had drilled twenty-seven oil wells upon lot 5. It could not be seriously contended that the possession shown was not "open and visible." The question suggested by the assignment under consideration really is, Was the possession, when considered in the light of the attendant circumstances, such as the nature and location of the land, the purposes for which it was adapted, the kind, character, and extent of the improvements, and the manner of their use, such as to satisfy the legal requirements of an adverse holding? We think the possession was clearly sufficient to support the issue of limitation.

It has been said that it is impossible to enumerate all of the facts necessary to establish open and notorious possession under all circumstances. Village Mills Co. v. Houston Oil Co. (Tex. Civ. App.) 186 S. W. 785, 799. The acts of the possessor must be such as to disclose his intent to claim the land. Titel v. Garland, 99 Tex. 201, 87 S. W. 1152. And such intent is shown by the doing of such acts as will ordinarily be expected of an owner. It was said by the Supreme Court in Nona Mills Co. v. Wright, 101 Tex. 14, 102 S. W. 1118, 1121, that: "To constitute adverse possession, the party occupying the land must in some way appropriate the land for some purpose to which it is adapted."

And in Richards v. Smith, 67 Tex. 610, 4 S. W. 571, 573, Judge Stayton said: "The character and situation of the land, and the uses to which it is adapted, and may be and is actually put, must be considered in determining whether an occupation is exclusive or not."

In McDow v. Rabb, 56 Tex. 161, the Supreme Court said: "When a man, under an open, avowed claim of title, enters regularly into the business of selling sand from the bank, or rock from the quarry, and this is continued for the length of time required by the statute, this has been thought sufficient."

We think the facts clearly show an open and visible use and appropriation of lot 5, of that character which imports a claim of right. They show such occupancy and use as under the circumstances would have been expected only of one claiming the land, either for himself or for the one under whom the possession was held. The digging of the pit on it, the placing of the structures and machinery thereon, and the constant use made of it when considered in the light of its character and location, evidenced a hostile claim to the land so apparent that appellant, if it was the true owner, was bound to take notice of the purpose and intent to claim it.

The following additional authorities support our construction of the facts of this case: W. T. Carter & Bro. v. Richardson (Tex. Civ. App.) 225 S. W. 816, 817; Carter & Bros. v. Richardson (Tex. Com. App.) 236 S. W. 978, 979; Brownson v. Scanlan, 59 Tex. 222; Mandelbaum v. Looney Mercantile Co. (Tex. Civ. App.) 293 S. W. 203; and the many authorities therein cited. Point 1 of the third proposition is overruled.

▆ (d) Point 2 of the third proposition is as follows: "Second: There is no evidence of any tenancy contract or agreement on the part of any of the receivers whose possession, use or occupancy is relied upon, (a) under Guilmartin prior to his deed to Yount in 1917; and (b) under Yount and the Yount-Lee Oil Company subsequent to that date."

We think there is ample evidence to show that the receivers held possession as tenants of Guilmartin, Yount, and Yount-Lee Oil Company. As already stated, after Chenault and Nearen had begun the construction of their pit on lot 5, and before its completion, they rented lot 5 from Guilmartin's agent, a lawyer by the name of Wilkinson, and paid him $20 for the first year's rent. Again in 1909, while W. S. Nearen was in possession claiming under his brother, Wilkinson entered upon lot 5 as Guilmartin's agent, stating to Nearen that he had charge of lot 5, whereupon he and Nearen made a new trade upon the same terms and conditions as the old

trade. Wilkinson told Nearen that Chenault and Nearen had paid him $20 per year for lot 5, which fact W. S. Nearen admitted to Wilkinson he knew, and thereupon W. S. Nearen paid Wilkinson $20 rent for the year 1909. Jack Cruse testified that he purchased the waste oil station from W. S. Nearen, who told him that he had a verbal agreement with Wilkinson (Guilmartin's agent) to use lot 5, and that he (Cruse) purchased with that understanding. He sold his station to H. L. Blanchette, who testified that Cruse told him he was supposed to pay rent whenever they called for it, and further stated, "You will have to pay that Mr. Blanchette"; that the station was not on the Mann acre. Mr. Blanchette further testified that, on the occasion of Mr. Yount's purchase from Guilmartin, which was in 1917, he (Mr. Yount) came out on the land with his agent, John Henderson, and it was then agreed that he (Blanchette) might continue to occupy the land; that Mr. Yount said to him, "Horace, you can go ahead and use it as long as you want it and if I ever want it I will give you plenty of time to move off." In 1919 Mr. Blanchette sold his pick-up plant to Mr. Wilkinson, who went in possession. The testimony of Mr. Yount corroborated Mr. Blanchette as to the agreement. Mr. Yount further testified that when he got ready to drill on the land he paid Mr. Wilkinson $100 for his tanks so he could move them off at once, as Wilkinson was entitled, under the agreement, to stay on the property thirty days after notice to move off. By the time the tanks were moved off, Yount-Lee Oil Company had set up a rig and begun drilling on the land.

The evidence, which we have only briefly summarized above, clearly shows privity between all the persons operating the pick-up station from the original entry in 1908, and that their holding was by contract with Guilmartin and Yount. In Mattfeld v. Huntington, 17 Tex. Civ. App. 716, 43 S. W. 53, 54, it was said: "The relation of landlord and tenant attaches to all who may succeed the tenant, immediately or remotely." 27 Tex. Jur. 54, announces the rule: "A tenancy from year to year is shown to exist where the occupant remains in possession after annual holdings or after the expiration of the term of years." 2 Tex. Jur. p. 78, states the rule: "In order to create the relation of landlord and tenant, it is only necessary that the tenant take possession by consent of the landlord. If a tenant enters under the title of another and holds by permission or at sufferance his possession is viewed by the law as

that of his landlord. And any persons who enter under the tenant are deemed to become the tenants of the landlord or lessor."

In Cobb v. Robertson, 99 Tex. 144, 86 S. W. 746, 748, 87 S. W. 1148, 122 Am. St. Rep. 609, it was said: "A contract of leasing or renting is not essential to the holding possession by one for another. If the tenant enter under the title of another, and hold by permission or at sufferance, he is estopped to deny such title, and the possession, in law, is that of the owner."

The following authorities support our conclusion that the evidence established that the "receivers" were tenants of Guilmartin, Yount, and Yount-Lee Oil Company. Houk v. Kirby Petroleum Co. (Tex. Com. App.) 65 S.W.(2d) 496; Id. (Tex. Com. App.) 67 S.W. (2d) 1112; Houston Oil Co. v. Niles (Tex. Com. App.) 255 S. W. 604; Fowler v. Simpson, 79 Tex. 611, 15 S. W. 682, 23 Am. St. Rep. 370.

■ (e) The third point of appellees' third proposition is as follows: "Third: The undisputed proof establishes that Guilmartin, prior to his deed to Yount in 1917, and Yount, prior to his deed to Yount-Lee Oil Company in 1923, asserted no adverse claim against the Federal Crude Oil Company, but claimed a fiduciary relationship toward the corporation as to the land in controversy, which fiduciary relationship claimed and asserted by them is not shown to ever have been repudiated and notice thereof brought home to the Federal Crude Oil Company of hostile assertion of claim on their part. And, therefore, in the absence of such proof of hostile claim, so brought home to the corporation, such possession as they may have had, or claimed, was not an adverse possession and claim to the land against the corporation, the true owner thereof."

The facts do not support this proposition. Guilmartin took a deed to the property from the Federal Crude Oil Company by Rutt, as receiver, on December 12, 1907, and caused it to be duly recorded on January 23, 1908. He rendered the land for taxation. It was assessed by him from the date of its purchase in 1907 until he sold it in 1917, and he paid the taxes on it. In selling the land Guilmartin executed to Yount a warranty deed on January 13, 1917. Through his agents, Guilmartin made lease contracts covering the property and collected the rent thereon. He affirmatively claimed title to the land, and his tenants were in possession of it. To the same extent and in the same way Yount-Lee Oil Company claimed the land. These facts

constituted an adverse claim and a repudiation of any fiduciary relation by Guilmartin towards appellant. The following authorities sustain this conclusion: 17 Tex. Jur. 597; Carlisle v. Gibbs, 44 Tex. Civ. App. 189, 98 S. W. 192; Hickman v. Gillum, 66 Tex. 314, 1 S. W. 339.

■ (f) The fourth and fifth points under the third proposition are as follows:

"Fourth: It is undisputed that the receivers whom the limitation is claimed were acting as such receivers under a lease in writing on the Mann acre, adjacent to Lot 5, and that in discharge of their duties as receivers by mistake they encroached upon the land in controversy, as claimed by defendants, with a pit in the edge of Lot 5, and with alleged tanks appurtenant thereto, and the evidence being without controversy that such encroachments were made by mistake long prior to any claim that they were by or with the consent of the adverse claimants, and the evidence being undisputed that such receivers made no enlargement of the improvements on such encroachment, after the alleged consent of said adverse claimant had been obtained, there is no predicate for the judgment holding title by limitation based thereon.

"Fifth: The mere encroachment over the line by the receivers, who had a lease on the Mann acre, where they were conducting the business of recovering waste oil under the orders of the court, there being no other use of the land in controversy than the trapping and recovering of said waste oil, there being no evidence of the extent of such encroachment over the line on Lot 5, and no proof of the use of all or any part of said Lot 5 beyond the catching and recovering of waste oil, or the extent and continuity thereof, there is no basis for adverse possession to Lot 5, nor to any defined or definite portion thereof within said claimed encroachment. Therefore, there was no notice given thereby of hostile claim to the land in controversy supporting limitation to any portion of Lot 5."

We think it clear that the facts take this case out of the encroachment doctrine, which is stated as follows by 2 Tex. Jur. 201: "Where an adjoining owner or claimant in possession, with his home or place of residence on another survey, crosses, either through mistake or design, upon the adjoining survey, through the medium of an inclosure, or otherwise, and thereby subjects a portion of the adjoining survey to a use, which, in its external manifestations, is merely subsidiary and incidental to, and therefore referable to, the home and place of residence, such encroaching possession and use is, as a matter of law, insufficiently distinct to afford a basis for the acquisition, under the statutes of limitation, of more of the adjoining survey than is actually so possessed and used throughout the statutory period."

While the original entry was by mistake, the mistake was soon discovered. The pit was completed and extensive improvements were made after the discovery of the mistake and the making of the tenancy contract.

■ We think the authorities fully support the legal proposition that the encroachment doctrine has application only where an adjoining owner has projected his improvements over his line and thereby occupied a small portion of the adjoining tract in such manner as to indicate from the nature, extent, and location of it, that such possession is merely incidental or subsidiary to the principal possession. Bracken v. Jones, 63 Tex. 184; Bailey v. Kirby Lbr. Co. (Tex. Civ. App.) 195 S. W. 221, 222; Holland v. Nance, 102 Tex. 177, 114 S. W. 346; Bender v. Brooks, 103 Tex. 329, 127 S. W. 168, Ann. Cas. 1913A, 559; Temple Lbr. Co. v. Low (Tex. Civ. App.) 260 S. W. 637. In such case it is clear that the acts performed do not evidence an intent to claim any land beyond that actually inclosed or used. Hence such a possession cannot become the basis of a limitation claim beyond the inclosure or occupancy until, by hostile acts which clearly evidence a greater claim, notice is brought home to the owner that the trespasser is claiming beyond his actual occupancy. But in the case before us the principal possession was on lot 5 here involved. The character and location of the improvements and the manner of their use so clearly evidenced a hostile claim to lot 5 that appellant, if it was the true owner, could not have been deceived as to the purpose and intent to claim it.

■ (g) Appellant's fourth proposition of law is to the effect that there was no proof of payment of taxes for any period of five years concurrently under a recorded deed by any person under whom the defendants claimed. Appellant's proposition seems to be based on the fact that for several years the title was in M. F. Yount, while the taxes were paid by Yount-Lee Oil Company. The undisputed fact is that the Yount-Lee Oil Company paid all of its taxes before delinquency for the year 1923 and succeeding years. The Yount-Lee Oil Company purchased lot 5; its

money being paid therefor, the deed being taken by Mr. Yount in trust for said company. The deed was dated February 13, 1917, was recorded February 17, 1917, in volume 161, page 546, of the deed records of Jefferson county, and purported to convey to M. F. Yount lot 5 of the land in controversy. M. F. Yount conveyed this lot to Yount-Lee Oil Company under date of October 11, 1923, deed filed for record October 18, 1923, and recorded volume 232, page 338, which deed contained the following recitation: "for and in consideration of the sum of $1.00 to me cash in hand paid by Yount-Lee Oil Company, a Texas corporation, the receipt of which is hereby acknowledged, and for the purpose of placing the title of the property conveyed into the rightful owner, the said Yount-Lee Oil Company having paid the original purchase price, when said property was conveyed to me, have granted," etc. That deed conveyed lot 5, the same land conveyed by H. L. Fagin in 1901 to Federal Crude Company by the deed above referred to. The point contended for by appellant seems to be that the five-year statute has no application because the taxes were not paid by the one holding title to the land. This fact did not prevent the application of the five-year statute of limitation (Rev. St. 1925, art. 5509). It is the settled law of this state that payment of taxes by a third person for one who claims by adverse possession, or the payment of taxes by a claimant to land who claims under a deed in the name of a third person, who holds for such claimant, fully complies with the requirements of the statute. Mariposa Land & Cattle Co. v. Silliman (Tex. Civ. App.) 27 S. W. 773; Thomson v. Weismann, 98 Tex. 170, 82 S. W. 503.

◼◼ Proposition No. 5 attacks special issues Nos. 1 and 2 on the ground that they were multifarious—(a) No. 1 on the ground that it assumed that the "boarded up pit"· was on lot 5. There was no issue in the evidence on that point. (b) No. 2 on the ground that the "cypress tanks" were on lot No. 5. That was the very issue submitted by Question No. 2.

◼By the sixth proposition appellant complains of the refusal of the court to submit the following special charges:

"Special Requested Charge No. 4

"Gentlemen of the Jury:

"In connection with the special issues submitted to you, you are instructed as follows:

"To constitute peaceable and adverse possession, as these terms are used in the charge of the court, there must not only be continuous occupancy and possession of the land, but in addition there must be such use of the land as it is fitted for or adapted to in its natural state; that is, such use as the true owner would usually and ordinarily put the land to if using it when in its natural state."

"Special Requested Charge No. 5

"Gentlemen of the Jury:

"In connection with the special issues submitted to you, you are instructed as follows:

"To constitute peaceable and adverse possession of land, as those terms are used in the charge of the court, mere occupancy of the land is not sufficient. The possession of the land must be so open, visible, notorious, distinct and hostile to all others as to give notice to the true owner of an intention to appropriate the land and assert ownership thereof."

"Special Requested Charge No. 6

"Gentlemen of the Jury:

"In connection with the special issues submitted to you, you are instructed as follows:

"Peaceable and adverse possession of the land involved in this suit, as those terms are used in the charge of the court, could not be constituted by occupancy and use of it under the mistaken belief that it was the Mann acre, or a part thereof."

The refusal of these charges was not error. The court, in the main charge, gave the statutory definitions of adverse and peaceable possession.

We think the wording of special charge No. 4 was calculated to mislead the jury. Appellant's contention was that it was the true owner of the land in controversy, and the charge would have meant to the jury that the use of the land by the Yount-Lee Oil Company and its predecessors must have been such use as appellant itself would have made of the property.

◼ The refusal of special charge No. 5 was not error. The statutory definitions of adverse possession and peaceable possession sufficiently covered every fact issue in the case, and there was no circumstance before the jury requiring the emphasis embodied in the requested issue to the effect that "the possession of the land must be so open, visible, notorious, distinct and hostile to all others as to give notice to the true owner of the intention to appropriate the land and assert ownership thereof." We think that every essential element of this charge was embodied in the court's main charge.

◼ The facts did not call for special issue No. 6. It was misleading in that it would

have carried the implication to the jury that possession taken under the mistaken belief referred to in this charge could not become adverse on discovery of the error in its location, and that the subsequent renting from Guilmartin would not have constituted an adverse holding. The facts show that the mistake was discovered in 1908, and that the greater part of the improvements were placed on lot 5 thereafter under the .agreement with Guilmartin, and with full knowledge of their true location.

By their seventh proposition appellants complain of certain argument of counsel. The bill of exception to this argument covers ten printed pages of appellant's brief. We have carefully considered the assignment, and do not think it presents error, particularly in view of the qualifications by the trial court, to the effect that the argument complained of was made in reply to argument of plaintiff's counsel.

By propositions 8 to 10, and 12 to 20, inclusive, appellant complains of the admission of certain testimony, all of the same general nature. Thus the witness H. L. Blanchette was permitted to testify that, when he purchased the pick-up station from Jack Cruse, "He (Cruse) told me that the boiler and tanks and big pit was not on the Mann acre," and further that Cruse said: "I paid a lease on it, or rent on it (Lot 5), and I am supposed to pay whenever they call on me. You will have to pay Mr. Blanchette; that is not on the Mann acre." The witness was further permitted to testify that, when Mr. Yount and his agent, Henderson, came out to the lot at the time Yount purchased from Guilmartin, Henderson said to witness, in the presence of Yount: "Horace, Frank (Yount) is going to buy this land. You know your tanks and boiler equipment is not on the Mann acre." To which witness replied, "Yes, I understand that;" and Henderson said, "It is all right with Frank for you to continue to use it;" whereupon Yount said to witness, "Horace, you can go ahead and use it as long as you want it, and if I ever want it I will give you plenty of time to get off." And witness further testified: "I offered to pay him a lease or lease it because I had the Mann acre leased. He (Yount) said, 'No, just go ahead and use it.'" Mr. Yount was permitted to testify to the same conversation. Other witnesses were permitted to testify to oral conversations of a similar nature. The witness Chenault testified that in 1908 he dug a pit, thinking it was on the Mann acre, but found out when he was

finishing it that it was on the land in controversy when a man named Wilkinson came there, and he leased from Wilkinson, paying him (Wilkinson) $20 a year "to put the stuff on it." The above recitals are sufficient to show the general nature of the testimony objected to. The objections urged were that it was hearsay, self-serving, and incompetent for any purpose. All the assignments are overruled. It was not objectionable as hearsay for one in possession to state by what .right he held or occupied the land in controversy. 17 Tex. Jur. 597, 599, 651; Dunn v. Taylor, 102 Tex. 87, 113 S. W. 265; Philadelphia Trust Co. v. Johnson (Tex. Civ. App.) 257 S. W. 280, 284. Nor was Nearen's testimony, to the effect that he leased from Wilkinson in 1908 and paid him $20 per year, subject to the further objection that Wilkinson was not shown to be the agent of Guilmartin. It appears without dispute, as we understand the evidence, that Wilkinson was the agent of Guilmartin. The testimony objected to was material both as to the time when the contract was made and as to the nature of the contract of tenancy by which Chenault and Nearen undertook to hold lot 5.

The eleventh proposition is that the court erred in permitting the introduction in evidence of an unrecorded bill of sale from Wilkinson to the Yount-Lee Oil Company dated July 14, 1926, which recited, among other things, that the tanks mentioned in the bill of sale were located on lot 5. This ruling did not constitute error. The bill of sale was admissible in that it constituted, in part, a description of, and identified, the property purchased by Yount-Lee from Wilkinson and which passed under the bill of sale. Again, if the part of the unrecorded bill of sale made the basis of this proposition was not admissible evidence, it was introduced without objection on the part of appellant. Therefore it was within the discretion of the court as to whether or not it would be withdrawn on appellant's motion to strike. Halsey v. Humble Oil & Refining Co. (Tex. Civ. App.) 66 S.W.(2d) 1082, 1091; Mitchell v. Deane (Tex. Civ. App.) 294 S. W. 347; Missouri Pac. Railway Co. v. Lamothe, 76 Tex. 219, 13 S. W. 194; Postal Telegraph Cable Co. v. Harriss, 56 Tex. Civ. App. 105, 121 S. W. 358, 362, 122 S. W. 891.

The twenty-first proposition is to the effect that the trial court erred in refusing to annul and set aside the findings of the jury on the issues of limitation, on the ground that the answers of the jury thereto are so against the great weight and preponderance

of the evidence as to be clearly wrong. We think the evidence, which we have fully discussed above, is ample to support the jury's findings.

### On Issue of Res Judicata.

 The questions discussed above relate only to the title to lot 5. Our affirmance of the verdict of the jury on the limitation issue results in an affirmance of the judgment of the lower court that appellant take nothing against appellee Yount-Lee Oil Company. This conclusion, however, has no relation to the judgment of the lower court in favor of appellee B. E. Quinn for title to lot 7. It is necessary, therefore, for us to consider appellees' counter propositions in support of their special defenses of res judicata and stare decisis, which the lower court sustained as a matter of law.

The origin of appellant corporation, its capital stock and number of shares, its purchase of the land in controversy, its default in the payment of its franchise tax, the resulting forfeiture of its corporate rights, the institution of suit No. 6398 on September 26, 1907, styled Guilmartin v. Federal Crude Oil Company, the appointment of the receiver in that case, his report, and the order of the court directing the sale of the property, the sale of the receiver and purchase by Guilmartin and the due recording by Guilmartin of his receiver's deed have all been stated above. We add to that statement that by his allegations Guilmartin owned 200 shares of appellant's capital stock. Appellant's charter provided for seven directors, and the original directors were H. L. Fagin, D. A. Duncan, H. H. Dorsey, Charles J. Chaison, R. C. Duff, Charles J. Swasey, and George A. Carden. Later Peter Anderson, W. J. Grant, and A. W. Russell became directors, and in 1908 said latter persons, together with H. L. Fagin, D. A. Duncan, Charles J. Chaison, and R. C. Duff, constituted the board of directors. D. A. Duncan was president. Charles J. Chaison was vice president, and until 1904 H. L. Fagin was general manager. He was succeeded as general manager by Marvin Scurlock. Charles J. Chaison and Marvin Scurlock, at that time and ever since both residents of Beaumont, Tex., between them owned 630,000 shares of stock in said company. We quote as follows from the order of the court directing the receiver to sell this property: "It further appearing to the court, from the report of said receiver, filed in this court on the 11th day of December, 1907, that the only property belonging to said corporation is two small tracts of land in Jefferson County, hereinafter described, and that said tracts of land are of little value, and that there is now due on said lands the state and county taxes for several years, and that at a public sale said land would not probably bring enough to pay said taxes, and that plaintiff in this case, J. F. Guilmartin, had offered to give $50 for said lands, subject to all valid liens for taxes on same, and it further appearing to the court, from the evidence in this cause, that it is for the best interests of all parties that said offer be accepted and said land sold and conveyed to said J. F. Guilmartin at private sale, for said sum of money, and all parties being present in court and consenting thereto, it is therefore ordered by the court that the receiver, C. L. Rutt, be and he is hereby authorized and instructed, upon the receipt of the sum of $50, to execute and deliver to J. F. Guilmartin a deed conveying all the right, title and interest of the Federal Crude Oil Company in and to the following described land" (then follows the description of the two tracts of land).

In 1919, D. A. Duncan, H. L. Fagin, Charles J. Chaison and Peter Anderson, constituting a majority of the board of directors of the Federal Crude Oil Company, entered into the following contract with W. D. Gordon:

"The State of Texas, County of Jefferson.

"This Memorandum of Agreement by and between the undersigned directors and trustees of the Federal Crude Oil Company, and on behalf of said corporation and the stockholders of said Company for whom they are in law or in equity entitled to act, herein styled parties of the first part, and W. D. Gordon of Jefferson County, Texas, herein styled party of the second part, Witnesseth:

"The parties of the first part have this day employed the party of the second part, and by these presents do hereby employ the party of the second part an attorney at law with the power and duty of instituting and prosecuting any and all such proceedings as may be necessary to recover from all adverse claims and clear the title to the property acquired by the Federal Crude Oil Company during the year 1901, in the John Douthitt Survey of land in Jefferson County, Texas, and particularly described in the deeds of record in that County, to which reference is made for more full description. And to this end he is authorized to institute any and all such suits as may be by him deemed necessary to remove any and all clouds cast on the title of said property from whatsoever source, and to place the same in marketable condition and reduce the same to possession.

"And in consideration of the services by the party of the second part hereinbefore indicated, and the further consideration that he will advance any and all costs and expenses necessary in the premises, including the payment of taxes which may be due and collectible on said property, and hold harmless the said parties of the first part from any and all such costs, expenses and obligations, we have this day granted, bargained, sold and conveyed, and do by these presents grant, bargain, sell and convey unto the said W. D. Gordon an undivided one-half (½) of all of the above described property and premises, and an undivided one-half (½) of any and all things of value recovered for and on behalf of the said Federal Crude Oil Company and its stockholders.

"It is understood, however, that the moneys advanced by the party of the second part shall be deducted by him from the total recovery herein contemplated before division is made.

"The party of the second part hereby covenants and agrees to indemnify and keep harmless the parties of the first part against any and all personal and individual liability of any nature and kind incident to and flowing from this contract.

"Witness our Hands this 9th day of June, A. D. 1919.

"——————————,

"Directors and Trustees of the Federal Crude Oil Company, Parties of the first part.

"D. A. Duncan
"H. L. Fagin
"Chas. J. Chaison
"Peter Anderson."

This contract was duly acknowledged by each of the directors.

The day following the execution of this contract, M. S. Duffie addressed a letter to M. F. Yount concerning the matter, in which letter it was stated: "Our Client is the Federal Crude Oil Company acting by its trustees." Shortly thereafter H. L. Fagin, D. A. Duncan, W. J. Grant, and A. W. Russell, through their attorneys, Gordon and Parker and M. S. Duffie, who acted by virtue of the foregoing contract, for themselves and as officers and directors and trustees and stockholders of the Federal Crude Oil Company, "and for said Federal Crude Oil Company," filed a suit in the Fifty-Eighth district court of Jefferson county against M. F. Yount, the then record title holder of lot 5, and B. E. Quinn, the then record title holder of lot 7 of the Douthitt survey, to recover said property and to cancel the Guilmartin proceedings. Plaintiffs pleaded in

their petition that the corporation's right to do business had been forfeited in 1906 and it was without right to sue in its own right; that the petition and citations in the receivership proceeding in cause 6398, which will be referred to as the Guilmartin suit, did not invoke the jurisdiction of the district court either as to the property of the Federal Crude Oil Company, or as to its person, and therefore all the proceedings, including the sale of the property, were absolutely null and void; that the court had no power or authority in that suit to appoint a receiver, or to dissolve the corporation, or to dispose of its properties, or to wind up its affairs; and that no title to the lands described passed by said pretended sale of C. L. Rutt, receiver, to J. F. Guilmartin. The prayer of the petition was as follows: "Wherefore, plaintiffs now come and file their suit and ask that the defendant be cited to appear and answer herein, and that upon a final hearing they have judgment cancelling the judgment, order of sale, and deed of conveyance made by C. L. Rutt, as Receiver of the Federal Crude Oil Company, for the title and possession of said land hereinbefore described and that defendants' title to same be cancelled, set aside and held for naught, and for costs of suit, and for all such other and further relief, general, special and equitable as they show themselves entitled to, etc."

The defendants Yount and Quinn in due time filed their answer to that suit, in which they set up their title acquired through the receivership proceeding, and pleaded in detail the petition for receiver, the service of notices and citation, the hearing, the appointment of the receiver, the report of the receiver, the final judgment of the court, and the deed by the receiver. The answer also asserted the right of the court to appoint the receiver and to make sale of the property, and that all the proceedings in the Guilmartin case were valid, and, further, that such proceedings, if not in every way regular, were not subject to attack in a collateral way at that late date; that the defendants purchased, paying full value therefor, in the firm belief that they were getting good title, relying upon the validity of such proceeding. The answer further set forth that any action attacking the judgment in the receivership was barred under the four and ten year statute of limitation of Texas. That suit was numbered 15248 on the docket in the district court of Jefferson county, and will be referred to as the Fagin suit. Upon final hearing on the 19th day of December, 1919, the district court entered judgment awarding the relief prayed for, being the cancellation and

annulment of the legal effect of the receivership proceedings including the appointment of the receiver, the receiver's report, the order of sale, and the receiver's deed, and also awarding to plaintiffs a recovery of the land as against the defendants.

Yount and Quinn duly appealed from that judgment. By an opinion rendered by this court on November 2, 1922, the judgment of the lower court was reversed and judgment rendered that the stockholders, the appellees in that case, the plaintiffs in the lower court, take nothing as against Yount and Quinn, the appellants.

A few brief quotations from the opinion of Judge Hightower, the then Chief Justice of this court, reported as Yount et al. v. Fagin et al., 244 S. W. 1036, will serve to show the issues presented and decided in that case. In the outset of the opinion, page 1037 of 244 S. W., Judge Hightower said: "The real controversy in this case is over the title to two small tracts of land, at one time admittedly owned by the Federal Crude Oil Company, a private corporation, which had its domicile in Jefferson county, Tex. The appellants here (Yount-Quinn et al.), who were defendants below, based their claim of title to the land on a judgment of the district court of said county, by which a receiver was appointed for the Federal Crude Oil Company, and the receiver afterwards sold the land, under order of the court and such title, if any, as passed by the receiver's deed, is now in appellants."

At page 1038, 1039 of 244 S. W., he said:

"The petition (of Fagin et al.) states fully the proceedings that were had in cause No. 6398, declaring the same null and void as a whole, and seeks a cancellation of the judgment, order of sale, and deed of conveyance made by the receiver, and for recovery of the title and possession of the land, and that defendants' title to the land be canceled, set aside, and held for naught, and the judgment herein granted to the plaintiffs such relief. * * *

"It is appellees' contention that the petition in cause No. 6398 did not invoke the jurisdiction of the district court, either as to the property of the Federal Crude Oil Company or as to its person, and that therefore all the proceedings, including the sale of the property, were absolutely null and void."

It was there held by this court, as shown by the opinion, pages 1039 and 1042 of 244 S. W.:

"We conclude that the court, under the rules of equity, as well as under the statute quoted (Art. 2128, R. S. 1911), had power to appoint a receiver for the Federal Crude Oil Company, which, as shown by the plaintiffs' petition, in cause No. 6398, had forfeited its corporate rights. * * *

"We think that the order appointing the receiver in cause No. 6398, the order of sale and the sale itself were in all respects binding and valid as against the attacks now made, and that the judgment of the trial court in this case must be, and the same is, reversed, and judgment here rendered that appellees take nothing as against appellants by this suit."

That holding absolutely, and without equivocation, adjudicated every issue now before us. If, as there held, the order of the district court appointing the receiver and the order of sale in the Guilmartin case were within the jurisdiction of the district court, and if, acting under the order of sale, the receiver made a lawful sale to Guilmartin, then appellees, holding under these orders of the district court, are the owners of lots 5 and 7, and appellant lost all its right, title, and claim thereto under the proceedings in the Guilmartin case. Such was the clear holding of Mr. Chief Justice Hightower. Appellant, represented by the very able attorney who is its leading counsel before us now, sued out a writ of error against the judgment of this court, which was dismissed by the Supreme Court for want of jurisdiction. We construe that order as a holding by the Supreme Court that Judge Hightower's ultimate conclusion was correct—that the order appointing the receiver and the order of sale were valid.

The writer of this opinion was not a member of this court when the Yount v. Fagin opinion was handed down. But, after a careful and painstaking review of that opinion and of the propositions and assignments now urged against it by distinguished counsel for appellant, he believes the correct disposition was made of all the issues by Judge Hightower.

It should also be said that the attack in the Yount v. Fagin Case was collateral and not direct. As we understand appellant's brief, the strongest authorities presented by it in support of its assignments against the receivership sale involved direct and not collateral attacks, and therefore are not in point.

But the Yount v. Fagin suit is not the only attack appellees have been called upon to defend against their receivership title. After the judgment in that case became final and on July 6, 1926, H. L. Fagin and D. A. Duncan, as complainants, filed a bill in equity in

the United States District Court for the Eastern District of Texas, seeking there to again consider the matters put forward by them and other directors and stockholders in behalf of the Federal Crude Oil Company in the Yount v. Fagin suit. In the case in federal court it was again asserted that the receivership proceedings in cause No. 6398, the Guilmartin suit, were void; that the court in that case acquired no jurisdiction over appellant's property or its person. The prayer was that the federal court declare void the proceedings in the state court as they affected the right and title of the Federal Crude Oil Company and its stockholders, and that the sale by receiver Rutt be held and declared void as a muniment of title, and that the decree of the District Court in cause 15248, the Fagin suit, be construed as valid, subsisting, and unreversed and unaffected by the order of this court on appeal (the judgment of Judge Hightower), for the reason that this court was acting in the premises without jurisdiction to reverse and annul the judgment and decree of the district court, and, further, in all events, that judgment be entered fixing and establishing that the defendants (these appellees) held the title to the land in controversy as constructive trustees, holding same in trust for the use and benefit of the stockholders of the Federal Crude Oil Company. It was also alleged in said bill, as a basis of said last relief prayed for, that, if any title passed by reason of the receivership proceeding, the same was in trust for the stockholders of the Federal Crude Oil Company, and that Guilmartin, neither in law nor in equity, could by said proceedings acquire the estate of his cotenants and must be held to have taken title as a constructive trustee.

The defendants (appellees herein) filed in federal court an answer to said bill, in which all the material matters therein were denied; they pleaded their title under the receivership proceeding in the Guilmartin case as they did in the Fagin suit in 1919. Said answer further asserted that no right of action existed upon the part of the complainants as such, that, if the matters alleged by complainants were true, the right of action alleged, if any, was in the Federal Crude Oil Company, and not in said complainants, and that the complainants in said suit as stockholders were without right to maintain in a federal court, as distinguished from a state court, a suit based upon a right of action inhering in the corporation. It was further asserted that said suit constituted a collateral attack upon the judgment in the Guilmartin receivership proceeding, and was an

attempt to attack collaterally the proceedings in the Fagin suit, as finally rendered by this court, that the suit was barred by laches and the four and ten years' statutes of limitation of Texas, and also that the judgment as to the sale of the property in the Guilmartin case was consented to by the defendant, and that said judgment was an adjudication of that fact, and, further, that the complainants for themselves, and as officers, trustees, directors, and stockholders of the Federal Crude Oil Company, had in the Fagin suit put forward the identical issues against the identical defendants that they were then submitting to the court, and that, by reason of the opinion and judgment of the Court of Civil Appeals in said cause, all matters there adjudged, determined, and decided were res judicata of the matters in issue, and operated as an estoppel against the complainants again attempting to adjudicate the matters and issues that had been previously adjudicated.

On January 17, 1927, Charles J. Chaison, Marvin Scurlock, F. J. Duff, D. W. Glasscock, and H. H. Dorsey, through their attorney, M. S. Duffie, with permission of the court, filed an intervention in said suit alleging that they were interested stockholders of the Federal Crude Oil Company and adopting the allegations of complainants' bill, together with their prayer. The original complainants and interveners owned "approximately eighty per cent" of the stock of the Federal Crude Oil Company.

In the federal court the plaintiffs contended that the action of this court in the Fagin suit was null and void for the reason that this court had not acquired jurisdiction of the case and its judgment did not operate to reverse the judgment of the trial court. Thereupon the defendants, who were appellants in the Fagin suit, filed a motion in this court, setting forth that such contention was being made in the federal court case and requesting that the judgment of this court be corrected by making entry nunc pro tunc so as to clearly show that the judgment of the trial court was in all things reversed and rendered. The motion was overruled on the ground that correction of the judgment was unnecessary for the reason, as stated in an opinion filed by Judge Hightower at the time (289 S. W. 187) that it was clear and certain from the judgment as entered that this court reversed the trial court on every material point involved and rendered judgment thereon in favor of appellants. Judge Hightower, in the opinion said:

"This is a motion filed by M. F. Yount, B. E. Quinn, and J. F. Guilmartin, who were the

appellants in the above entitled and numbered cause, praying that this court enter an order at this time correcting and amending the judgment entry in this cause as it appears upon the minutes of this court, so as to make the same reflect more clearly the judgment that this court rendered in this cause.

"The judgment, the entry of which is sought to be corrected, was rendered and entered on October 5, 1922. By this judgment, as we construe it, it is clear and certain that this court reversed the trial court's judgment on every material point involved in the appeal, and rendered judgment thereon in favor of the appellants. * * * Certainly, it is plain and clear from this court's judgment, as entered, read in the light of its opinion, that this court reversed the judgment of the trial court wherein that court held that the appointment by the court of the receiver in cause No. 6398, and the receiver's acts under that appointment were invalid and void, and this court rendered judgment to the contrary. It is also clear and certain from this court's judgment, as entered, read in the light of our opinion, that this court reversed the judgment of the trial court wherein that court held that the appellants in this cause were not entitled to recover the two tracts of land in controversy on their plea that they were innocent purchasers, and that this court rendered judgment to the contrary."

A trial of said federal court suit was had on the merits and a final decree was entered dismissing plaintiff's bill. In connection with the judgment, Judge Estes filed a memorandum opinion wherein he said, among other things:

"Of course, what is involved in this controversy is this land. That is the sum and substance of it all, just as Judge Hightower said in that opinion. He said what was involved in the suit before him was the land, that the real controversy was over the title to land. Now, this is an equitable action. The court is called on here to employ the powers of a chancellor in administering what, according to the conception of the court, would be the right—what Mr. Gordon has termed 'the righteousness of the case.'

"The undisputed facts show that this corporation was, to all intents and purposes, abandoned, not necessarily dissolved in a technical sense but the purpose of the corporation had failed, no oil had been procured, the officers were away, its right to do business, it has been shown, had been forfeited, and this suit—that is the original suit in 1907 —was instituted with allegations that, it seems clear enough to me, were sufficient to give the court jurisdiction over the subject matter involved. It ordered this property sold, the order reciting service on the proper parties, and ordering and directing the deed to be made to this man Guilmartin. After that time a suit was brought to set aside that conveyance—the suit referred to as the 1919 suit.

"Under my view, practically all the matters involved here were presented in that suit, the authority of the court in 1907 to make that conveyance; the title to the land really was pleaded and the Court of Civil Appeals determined that issue between the parties that are before the court now, determined those issues, and' on grounds that are set forth in the opinion. Now, it is a most powerful and ingenious argument that Mr. Gordon makes about the jurisdiction of that court and the holding of that court, but what he says as regards the holding is directly and flatly in the face of what the court in the opinion, which was the basis of the judgment, says that the court decided. Now, I don't know—it seems to me that this court, in determining the rights of the parties, ought not in the face of the direct expressions of that court, to say that a different holding was meant than was expressed. * * *

"Now, that became a final judgment. It was appealed from. All parties connected with it understood what its meaning was. The entire proceedings in that case are before this court and the construction placed by the Court of Civil Appeals appears to have been adopted by the parties and all the counsel in it. * * *"

The case was appealed to the Circuit Court of Appeals for the Fifth Circuit, and the judgment of the District Court affirmed. Fagin v. Quinn, 24 F.(2d) 42.

Notwithstanding the claim of appellants that they were not the identical parties with plaintiffs in the 1919 suit, the Circuit Court of Appeals held that the cause of action and the representation was the same and that the judgment of this court in 1919 (Yount v. Fagin) suit was res judicata of all the contentions as made by appellants in that case. In refusing appellants' contention that the judgment of this court only reversed in part the judgment of the District Court in the 1919 suit, the Circuit Court of Appeals said, Fagin v. Quinn, 24 F.(2d) 42, 44: "Where the issues are identical, the fact that the relief prayed for is slightly different is im-

material. The Court of Civil Appeals was competent to reverse the judgment of the trial court in the suit brought in 1919 by appellants against appellees. It was there decided that the Guilmartin judgment, under which appellees claim title, was valid. That decision became final, and, whether right or wrong, cannot again be brought in question by an original bill in a federal court. * * It clearly appears from the opinion of the Court of Civil Appeals that it was intended to reverse the judgment of the trial court, but that it was unnecessary to decide whether the earlier judgment in the receivership proceedings should have declared the dissolution of the corporation. The judgment of the appellate court denies a recovery not only of title and possession, but of any right or interest in the land. * * * "

Appellants in that suit petitioned the Supreme Court of the United States for writ of certiorari, which was upon the 4th day of June, 1928, in all things denied. Fagin v. Quinn, 277 U. S. 606, 48 S. Ct. 602, 72 L. Ed. 1012.

It is appellant's theory that, since it was denied the right to sue in its corporate capacity all during that time by the forfeiture of its franchise, it is now in court for the first time, and that consequently the judgments in the Fagin Case could not affect its title. We think this proposition is untenable. Since it had forfeited its right to sue by failing to pay the franchise tax, any stockholders could prosecute such suits as necessary to protect the property of which they were the beneficial owners. Federal Crude Oil Co. v. Yount-Lee Oil Co., 122 Tex. 21, 52 S.W.(2d) 56; Favorite Oil Co. v. Townsite Co. (Tex. Civ. App.) 162 S. W. 423. We have no doubt that, if the judgment in the Fagin Case had been finally determined in favor of Fagin and the other stockholders who there sued, the judgment would have inured to the benefit of the appellant, which is but the alter ego, the legal entity, of the stockholders. We think it equally true that appellant is bound by the judgment which adjudged to appellees the land involved.

From the lengthy summary above of the pleadings and judgments of state and federal courts, it thus appears that stockholders and former directors of the appellant, assuming to act for all stockholders not parties as well as for themselves, and at a time when appellant could not act in its corporate capacity, have twice sued the appellees for title and possession of the identical property here involved, and have asserted in said suits the identical ground for recovery here urged—invalidity of the Guilmartin receivership proceedings. By final judgments of the courts of last resort, state and federal, appellees' title has been twice upheld.

We have no doubt that the principle of res judicata applies in this case. It is a sound and well-recognized policy of the law that there shall be an end to litigation. The reason for the doctrine is well stated by Mr. Black in his work on Judgments (2d Ed.) vol. 2, par. 500, p. 759, as follows: "That the solemn and deliberate sentence of the law, pronounced by its appointed organs, upon a disputed fact or state of facts, should be regarded as a final and conclusive determination of the question litigated, and should forever set the controversy at rest, is a rule common to all civilized systems of jurisprudence. But it is more than a mere rule of law. It is more even than an important principle of public policy. It is not too much to say that this maxim is a fundamental concept in the organization of every jural society. For unless every judgment should at some point become final, and have the quality of establishing its contents as irrefragable truth, litigation would become interminable, the rights of parties would be involved in endless confusion, the courts, stripped of their most efficient powers, would become little more than advisory bodies, and thus the most important function of government—that of ascertaining and enforcing rights—would go unfulfilled."

If we are correct in our conclusions on res judicata, appellant's interesting and well-briefed propositions attacking the receivership sale in the Guilmartin case present mere abstract propositions of law, and it would serve no useful purpose again to review them. We will say, however, that, as this court construes his opinion, Judge Hightower anticipated and answered every proposition now advanced by appellant in its attack upon the receivership sale in the Guilmartin case. We refer to Judge Hightower's opinion for a detailed statement of the facts, and adopt his conclusions and authorities in answer to appellant's ably briefed propositions. To the authorities cited by Judge Hightower we would add the recent decision of the Supreme Court in Pratt-Hewitt Oil Corp. v. Hewitt, 122 Tex. 38, 52 S.W.(2d) 64.

We cannot agree with the conclusion of appellant that the propositions upon which Judge Hightower rested his judgment are obiter dicta. We think all that Judge Hightower said was in point on the issues before

him and has clear support in the authorities cited by him.

For the reasons stated, the judgment of the lower court is in all things affirmed.