CROW v. CHILDRESS et al. (No. 7171.)

(Court of Civil Appeals of Texas. Dallas. June 20, 1914. Rehearing Denied Oct. 17, 1914.)

1. APPEAL AND ERROR (§ 501*)—PRESENTATION OF GROUNDS OF REVIEW IN COURT BELOW— EXCEPTIONS—SUFFICIENCY.

Under Rev. St. 1911, art. 2061, as amended by Acts 33d Leg. c. 59, providing that the ruling of the court in giving, refusing, or qualifying instructions shall be regarded as approved, unless excepted to, the appellate court will not review the denial of an instruction, where the record contains no bill of exception showing that the refusal was duly excepted to.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2300–2305; Dec. Dig. § 501.*]

2. DEEDS (§ 211*)—ACTIONS TO SET ASIDE— WANT OF CAPACITY.

In a suit to set aside a deed on the ground that the grantor was not possessed of sufficient understanding to comprehend the nature of the transaction, a verdict for plaintiffs, *held* contrary to the great weight and preponderance of the evidence, and to be set aside.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 637–647; Dec. Dig. § 211.*]

3. DEEDS (§ 68*)—VALIDITY—CAPACITY.

Neither old age, sickness, nor distress in mind or body incapacitates a grantor, who has possession of his mental faculties and understands the transaction in which he is engaged, from disposing of his property.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 149–155; Dec. Dig. § 68.*]

Appeal from District Court, Hill County; Horton B. Porter, Judge.

Action by A. W. Childress and others against George W. Crow. From a judgment for plaintiffs, defendant appeals. Reversed and remanded.

Collins & Cummings and Morrow & Morrow, all of Hillsboro, for appellant. Dean, Humphrey & Powell, of Huntsville, and Wear & Frazier, of Hillsboro, for appellees.

TALBOT, J. A. W. Childress and others, as relatives and heirs at law of John S. Childress, deceased, brought this suit against the appellant, Geo. W. Crow, to set aside a deed executed by the said John S. Childress on the 25th day of July, 1912, conveying to the appellant all of the undivided interest which the said John S. Childress owned in certain real estate situated in Hill county, Tex., as an heir of Elizabeth Batson, deceased. The grounds upon which the appellees seek to set aside the deed to appellant are want of mental capacity in the said John S. Childress and the exercise of undue influence to secure the execution of said deed. A jury trial resulted in a verdict and judgment in favor of the appellees, and the appellant appealed.

The issue tendered by the pleadings of the appellees, to the effect that undue influence had been exerted over John S. Childress to procure the execution of the deed sought to be annulled, was not raised by the evidence, and was not submitted to the jury.

[1] The first assignment of error complains of the court's refusal to charge the jury, at appellant's request, as follows:

"Gentlemen of the Jury: J. S. Childress had the right to convey his property or deed part of it as he wished to George Crow, and the only question for you to decide is whether, at the time J. S. Childress made the deed to George Crow, he was of sound mind; that is to say, whether at the very time he signed the deed he had sufficient understanding to know the effect of the deed, and in this connection you are instructed that neither old age, sickness, nor extreme distress of mind or body will render a person incapable of disposing of his property, provided he is possessed of his mental capacity and understands the nature of the business in which he is engaged, at the time of the transaction in controversy."

The action of the court in refusing this charge cannot be reviewed by this court. Article 1974 of the Revised Statute of 1911, as amended by the Acts of the 33d Legislature, page 113, provides that when instructions asked, or some of them, are refused, the judge shall note distinctly which of them he has given and which he has refused, and shall subscribe his name thereto, and such instructions shall be filed with the clerk and shall constitute a part of the record of the cause, subject to revision for error; and article 2061 of said statute, as amended by said act of the Thirty-Third Legislature, is as follows:

"The ruling of the court in the giving, refusing or qualifying of instructions to the jury shall be regarded as approved unless excepted to as provided for in the foregoing articles."

Now, there is no bill of exception in the record showing that the refusal of the trial court to give the special charge in question was excepted to by appellant, and in the absence of such bill the action of the court must be regarded as having been approved, or the error, if any, in refusing the charge waived. Mutual Life Ins. Ass'n v. Rhoderick, 164 S. W. 1067; Roberts v. Laney, 165 S. W. 114; Railway Company v. Galloway, 165 S. W. 546; Railway Co. v. Crutchfield, 165 S. W. 551; Railway Company v. Wadsack, 166 S. W. 42; Railway Co. v. Love, 170 S. W. ——,[1] decided by this court, not yet officially reported.

[2, 3] Appellant's next assignment of error, which is submitted as a proposition, is that:

"The verdict of the jury should be set aside, because the evidence failed to show that, at the very time the deed to George Crow was made by J. S. Childress, he was not possessed of sufficient understanding to comprehend the nature and effect of said transaction, but, on the contrary, it affirmatively appeared from the evidence of the witnesses who were present at the time the deed was made that said J. S. Childress fully understood its effect and nature, and that at the time he was of sound mind."

It is further contended that the court erred in failing to grant a new trial, because the verdict of the jury is against the great weight and preponderance of the evidence. After a careful consideration of the evidence as a whole, we have reached the conclusion that, if it can be said that it was of sufficient force to take the case to the jury, yet the verdict rendered is, as contended by appellant, against the great weight and preponderance of the evidence, and the court should have granted a new trial. The substance of the pertinent testimony relied on by the appellees is that John S. Childress, the grantor in the deed sought to be set aside, was, at the time of the execution of said deed, an old man 87 or 88 years of age, badly diseased, and had been for 3 or 4 weeks immediately preceding his death confined to his bed; that during this time he had to be helped around something like a person who had no use of himself at all; that his sister, Mrs. Batson, from whom he inherited the property conveyed to the appellant by the deed in question, died a few months prior to his death, and that at the time of her death he seemed to be worse than he had ever been, and that he got weaker thereafter all the time; that the said John S. Childress, and his sister, Mrs. Batson, had been living in the same house for a number of years, were closely associated, and thought a great deal of each other; that the news of his sister's death did not seem to have any effect upon him.

The witness H. W. Grissom, a nephew of the deceased John S. Childress, said that the latter did not comment on Mrs. Batson's death, and that if he ever shed a tear on account of her death the witness did not see it; that sometimes, when he would go into the presence of the said Childress after his sister's death, he would not be recognized; that sometimes the said Childress would in conversation "start out all right on a subject, and would stop maybe and start out on a

[1] Rehearing pending.

different subject; that a niece of the said Childress died a few years prior to his death, and that he took her death very hard, but that his sister's death "did not seem to bother him at all"; that witness' mother, Mrs. Susan Grissom, one of the appellees, was a sister of the said Childress and a woman of very moderate means; that the relation between the witness' mother and Mr. Childress during his lifetime had been very friendly; that the appellant was an unmarried man, and had lived with Mr. Childress before the latter's death. The conclusion of this witness was that the said Childress was of unsound mind. When on cross-examination he was reminded that he had sworn that in his opinion his uncle was of unsound mind, he stated:

"I didn't say he was crazy; the old man was absent-minded."

A. W. Childress, a brother of the said John S. Childress, and who had been living in Arizona since about the year 1887, testified that in the month of August, just preceding the death of John S. Childress, he was at his house in Hill county, and that John S. Childress at that time "was pretty low down and sick"; that he could not tell what was the matter with him; that he just seemed drowsy all the time; that he did not recognize the witness the first day he arrived at his house; that he did recognize him on the second day after his arrival, but did not, he thought, recognize him the third day; that his brother was weak and could not sit up long; that he stayed at his brother's house in August three or four days, and that he did not think his mind was as good as it had been. He further said:

"I don't think, in his condition at the time that I saw him, that his mind was sound to what it had been heretofore to a certainty."

Mrs. Susan Grissom testified that her sister, Mrs. Batson, died July 16, 1912; that at the time of her sister's death she was living about 200 yards from John S. Childress' home; that the relations between her brother, John S. Childress, and herself, were friendly, and that he had cared for her ever since her husband's death; that John S. Childress' health was "mighty bad" for a long time before he died, and "grew worse all the time"; that at the time of Mrs. Batson's death he was in a helpless condition; that she saw him often after Mrs. Batson's death, and that she did not think he had a sound mind before her death, and that his mind grew weaker all the time; that she was "there at the place at the time that Capt. McKinnon came out there to write this deed"; that she was in the room at the time he wrote it; that she did not stay in there, because they did not tell her anything about what they were doing, and that her brother did not look to her like he knew there was anything going on; that while Capt. McKinnon was writing the appellant, Crow, was standing by him; that at this time her brother, John Childress, wanted to get up, and called for Levi, and that she walked out in the hall, and Capt. McKinnon came out and told her that George Crow (the appellant) came after him the day before to do some writing for John, and that that was all she knew about it; that when she first went into the room where her brother was she spoke to him, and he said he was "mighty poorly"; that this was all the conversation she heard him engage in while she was there. This witness further testified on redirect examination that her brother, John Childress, had an affliction on the back of his ear a long time ago; that the place was always tender, and he called it "king's evil"; that in his last illness he told witness that he had never had this affliction, and that in her opinion he was of unsound mind.

Practically to the same effect as the foregoing is the testimony of several other witnesses, and in addition thereto, Gregg Campbell, a negro, testified that he had known John S. Childress all his life; that Mr. Childress in his lifetime seldom went to Whitney that he did not call to see him and talk to him; that it was possibly a year before his death that he was at his house, but that he would often meet him uptown; that he went to see Mr. Childress at his house about two days after Mrs. Batson's death; that he did not talk with him much then, because he did not seem to want to talk; that he was then in bed, and did not know him when he went in, but after awhile recognized him; that the mother of witness died about seven years before Mr. Childress died; that Mr. Childress knew her well and knew she was dead; that one time after his mother's death Mr. Childress was talking, and as he (witness) was leaving to go home, Mr. Childress said: "Well, take care of Liza" (witness' mother); that he remembered well that one time he bought some peanuts, and that Mr. Childress said, "When we get ready to start, you take them and give them to your children, and give some of them to Liza," and that witness said, "Marse John, don't you remember that my mother has been dead some time?" and that Mr. Childress "just seemed to study, and never said anything, didn't even grunt"; that they talked a few minutes longer and Mr. Childress brought up his mother's name, and that witness said, "Marse John, don't you recollect I told you that she was dead?" and that Mr. Childress just said, "Uh-huh;" that when he saw Mr. Childress after Mrs. Batson's death his mind seemed to be weaker than it was when the incident related occurred; that judging from what he knew of Mr. Childress before, and his conduct and character, and from what he had seen of him after the death of Mrs. Batson, and judging from his conduct when he visited him at his home, he was of opinion that Mr. Childress was of unsound mind. This witness further testified:

"I don't want to be understood to say that his mind was bad at all times; it was seemingly bad to me sometimes. I don't want to be understood to say that he was crazy. It seemed that sometimes his mind wandered. I don't mean to tell the jury that it was that way all the time, but just sometimes." That Mr. Childress was hard of hearing and could not see well. That when he went into Mr. Childress' room some one said that that "was Gregg, and then he spoke up and recognized me, and seemed to kind of know me, and seemed to be glad to see me." That they then talked about different things, about the time he had lived there, and "a right smart little bit about a Mr. Dollar, a man that used to live there, a white man, who had moved to Whitney."

Capt. A. P. McKinnon, a witness tendered by the appellant, testified:

"I have examined the copy of the deed attached to these interrogatories, it being a deed from J. S. Childress to George W. Crow, bearing date the 25th day of July, 1912, and I am the same A. P. McKinnon who took the acknowledgment to the original deed, to which that hereto attached is a copy. I wrote the deed inquired about. The circumstances under which I wrote it are substantially as follows: Some time prior to the date when I wrote said deed Mr. John Weich, a neighbor of Mr. J. S. Childress, came to me in Hillsboro, Tex., and stated to me that Mr. J. S. Childress wanted me to come out to his house and draw up some papers for him. I told him to tell Mr. Childress that I would come any day that he would send for me. Some time after that, the number of days I do not remember, George Crow came in for me to go out to J. S. Childress' home. I left town after dinner with George Crow, and went out to Mr. Childress' home. We reached there some time late in the evening. I went in the house, and Mr. Childress stated to me that he was glad to see me; that he wanted to draw up some deeds. I told him that if it was agreeable to him I would defer doing it until the next morning. I spent the night at his house, and the next morning I wrote the deed in question. I wrote it at the direction of J. S. Childress, and Mr. John Weich was present a part of the time, and George Crow was present a part of the time. Prior to the date said deed was written I was acquainted with the grantor therein, J. S. Childress. I had been acquainted with said J. S. Childress since shortly after locating in Hill county in 1873. At the time said deed was executed the said J. S. Childress was an old man and feeble in health. After supper on the evening when I arrived at the home of J. S. Childress we talked quite a good deal. He got up and sat in a chair. I offered him a cigar, which he accepted and smoked. I cannot state in detail the conversation I had with him, but it was in reference to mutual acquaintances and past events which had occurred during each of our experiences in Hill county. The next morning, just before writing the deed, he told me that he wanted to deed to George Crow some land, and wanted to know whether he could make the deed to take effect at his death. I told him that he could. In this connection he stated that George Crow had been very kind to him during his illness, and had made sacrifices on his account, or something to this effect, and that he wanted him to have the land at his death. He also directed where the deed could be found which would enable me to get a description of the land. It is my opinion that at the time said deed was executed J. S. Childress, the grantor, was of sound mind. I knew nothing as to George Crow having exerted any undue influence over J. S. Childress in order to procure said deed. There was nothing occurred at any time prior to the execution of said deed or afterwards which indicated to my mind that the making of said deed was not the act of the

said J. S. Childress. If he was under the influence of the said George W. Crow, or any one else, I knew nothing about it. No occurrence happened which indicated any such thing to my mind. I located in Hill county in January, 1873, and became acquainted with J. S. Childress some time after that, but I can't say exactly when. I do not think it was later than 1874. I was not intimately acquainted with J. S. Childress, but from what I knew of him I took him to be a man of decided character. He was regarded as a splendid citizen. Further than this I cannot say."

Counsel for defendant also offered in evidence the answers of said witness to the cross-interrogatories propounded by counsel for the plaintiffs as follows:

"Mr. John Weich first told me that Mr. Childress wanted me to draw up some papers, and I went out to his home afterwards and wrote the deed under the circumstances already explained. George Crow paid the money for the services I rendered. I was at Mr. Childress' home in the back yard when George Crow in person paid me. I do not remember that any one was present when I met J. S. Childress on the evening I went to his home when he told me he wanted me to draw up some deeds. I think George Crow remained outside putting up the horse, and I went into the house where Mr. Childress was lying down, and I do not remember that any person came in while we were talking at that time. At the time Mr. J. S. Childress signed the deed, Mr. John Weich was present, and my best recollection is that George Crow was present. I am not sure that Mr. Childress' sister, who was living there at the time, was present or not. I do not know what Mr. J. S. Childress' age was at the time that he signed the deed. I think he told me what his age was the night previous, when we were talking; but I, do not remember it. It is a fact that he appeared to be an old man and he was feeble in health. It is my opinion, judging from the appearance of J. S. Childress at the time in question, that he was somewhere between 70 and 75 years old, at least he looked to be that old. I cannot remember how long it had been since I had seen J. S. Childress before writing the deed in question, but the best I can remember it had been 10 or 15 years. I do not know anything about the influence that George Crow had attempted to use with Mr. Childress to induce him to sign the deed inquired about. I was engaged in the practice of law, and I wrote the deed under the circumstances heretofore stated. After having talked with J. S. Childress, and observed the manner in which he expressed himself with reference to the execution of the deed, his ability with which he could refer to data by which the deed could be written, his inquiry as to whether it could be made to take effect at his death, it never occurred to me that any one had exercised any undue influence over him. He talked as intelligently and as correctly about things past and present as could be expected of any one not having better educational advantages. His mind seemed to be perfectly clear about the business which he contemplated transacting. There was nothing connected with the whole business which suggested or indicated to me that undue influence was being brought to bear upon him to procure the conveyance."

Miss Savilla Childress testified:

"My name is Savilla Childress. I am 65 years of age, and reside in Hill county, Texas. I am aware of the fact that J. S. Childress executed a deed to George W. Crow about the 25th day of July, 1912. I am acquainted with J. S. Childress. I saw the deed wrote and signed. I did not have any conversation with J. S. Childress before or about the time of the execution of said deed. I did not observe anything

peculiar about J. S. Childress or his conduct. In my opinion J. S. Childress' mind was as sound at this date as it ever was. J. S. Childress was 87 years old, and lived on the old home place for about 42 years. When in need of special care, G. W. Crow and L. Y. Crow were in attendance on him up to the time of his death. J. S. Childress was my brother. George W. Crow is my nephew. I was present at the time the deed inquired about was executed. There was no plan adopted, and to my knowledge there was no influence exerted, by G. W. Crow upon J. S. Childress about executing the deed in question. It is a fact that J. S. Childress was very old, feeble, and decrepit on the 25th day of July, 1912. At that time he was in his eighty-seventh year, but was worse for about 5 months previous to his death. He was afflicted with old age and rheumatism. He was very feeble, but able to sit up and eat his meals regular. It is not a fact that J. S. Childress was very childish on or about the 25th day of July, 1912. It is a fact that for a part of the time before his death he had to be waited upon like a child. On the 25th day of July, 1912, I lived on the old home place, where J. S. Childress lived, and was constantly associated with him. He lived with me and my sister, Elizabeth Batson, up to the time of her death, and also George W. Crow, who was living with us, for about 8 years. He died at his home place. I and G. W. Crow and L. Y. Crow took care of him during his last illness."

Mrs. C. J. Crow testified:

"I am 63 years old and live in Hill county, Texas. I was acquainted with J. S. Childress. I was not aware of the fact that a deed had been executed by J. S. Childress to George W. Crow about the 25th day of July, 1912, until the day of its execution. I did not have any conversation with J. S. Childress before or about the time the execution of said deed. I did not notice anything peculiar about the conduct of J. S. Childress, either before or after the deed was executed. In my opinion his mind was sound at the time he executed the deed, and was so up to the time of his death. He was about 87 years of age, and lived on the Childress farm for about 42 years, and was looked after at the last by his sister Savilla Childress, and G. W. Crow and L. Y. Crow. I was a sister to J. S. Childress. I am George W. Crow's mother. I was present at the time the deed inquired about was executed. To my knowledge there was no plan or undue influence exercised by George W. Crow upon J. S. Childress to get him to execute the deed in question. It is a fact that J. S. Childress, on the 25th day of July, 1912, was old, and feeble in consequence thereof. On that date he was about 87 years old, and his health was bad. He had been in bad health for several years from old age and rheumatism. He did not have much strength, but was able to sit up for hours at a time. It was not a fact that J. S. Childress, on or about the 25th day of July, 1912, was very childish. On account of rheumatism he had to be helped for several weeks previous to his death. On the 25th day of July, 1912, I lived on our farm about 12 miles west of Hillsboro, and about a half mile from J. S. Childress' residence. I was with J. S. Childress frequently. He lived with his two sisters at his own home. He died at his own home. His sister Elizabeth Batson took care of him before his death, and Savilla Childress and G. W. Crow and L. Y. Crow, his nephews, took care of him during his last illness."

C. F. Wood, a witness who was not related to the parties, testified that he saw John Childress during his last illness at his home; that they discussed the dry weather and drouth principally; that he recalled one thing that Mr. Childress mentioned, something that he had never forgot, that he said, "I am trying to learn the boys to be saving of their corn when they first gather, not to wait until it is all gone, and then commence to be saving of it;" that then they talked about other things, just the general topics of the day; that he never thought about such a thing as his mind being in bad shape, any more than he did 40 years ago; that he could not say that his mind was just as good as it ever was, but that he believed that he was a man of good sound mind.

John Weich testified:

"I was acquainted with J. S. Childress during his lifetime. I first got acquainted with him in June or July of 1873. I am not related to him. I live something between 2 or 3 miles from where he lived. I have lived a neighbor of his ever since I have been in Hill county, and I was well acquainted with him. I know about his making a deed to George Crow. I am acquainted with Capt. A. P. McKinnon, and have known him I expect for about 40 years. I carried a message from Mr. Childress to Capt. McKinnon. Mr. John Childress requested me to see Capt. McKinnon and find out if he would come out there and execute some papers. John Childress told me that on the Sunday before Capt. McKinnon came out there. That conversation between me and John Childress took place at his house. He was sitting up, and I was talking to him. I don't know exactly how long we talked, maybe 15 or 20 minutes. I know that Capt. McKinnon went out there. He told me to come there the next morning and witness the papers, and I went. Capt. McKinnon was there the next morning when I went there. I did not hear any conversation between Capt. McKinnon and Mr. Childress. I saw the papers there. When I got there the paper had already been written, and when I got there Capt. McKinnon read the paper over to Mr. Childress for him to sign it. When Capt. McKinnon read the paper, I understood it to be a deed to what he had inherited out of Mrs. Batson's estate to George Crow, to be in effect after his death. I read the paper over there that morning, and I heard Capt. McKinnon read it. Before Mr. Childress signed it, he said that 'was all right'; I saw him sign it. I think Miss Savilla Childress, Mr. Childress' sister, was present, and Capt. McKinnon and me. I could not recall whether Mr. Crow was there or not; there was more or less going through the room; they had to go through there into the dining room. George Crow was working there on the shares, and had been working there for 7 or 8 years. I know that Mr. Childress' feelings were friendly and kindly toward George Crow. I have heard Mr. Childress say that he did not know how he could ever repay George Crow for what he had done for him. At the time that this deed was executed and delivered, and at the time that Mr. Childress sent me after Capt. McKinnon, in my opinion Mr. Childress' mind was as sound as it had ever been since I had known him. Of course, he was feeble, bodily; but then I don't believe that that affected his mind a particle. I had known Mr. Childress a little over 40 years. To my mind and to my knowing, his mind at 88, suffering with disease, was just as good as it ever was. He suffered with rheumatism, and I believe he said he had a bowel complaint. He grew to be very feeble."

Dr. W. R. Dean testified:

"I have been practicing medicine since '82. I knew J. S. Childress during his lifetime. I attended him professionally during the latter part of his life. He died along the latter part

of November, 1912. I was not attending him during the latter part of July of that year; nothing more than prescribing for him. I saw him in July, I believe. I was going to see his sister who died, I think, in July, and I usually went in and talked with him every day I was there. In my conversations with him at that time, his manner and conduct was about as usual, as far as I could see. There was nothing peculiar or unusual about him, more than he was weak and helpless. I do not remember the space of my conversations with him, but I usually just went and talked with him, usually about his own condition and such as that. My opinion is that his mind at that time was good. I remember having a talk with Mr. Manley about the condition of Mr. Childress' mind in Whitney some three months ago. I did tell him in that conversation, when he inquired of me as to what I thought about the condition of the old man's mind, that he was just like a baby before he died. I did not tell him that his mind was off at that time in any way, I did not tell him that his mind was just like a baby's in July. Mr. Childress had a chronic bowel trouble, and had rheumatism, and his hands would swell. Rheumatism is very wearing on the constitution of a man, especially an old man. That bowel trouble is especially wearing on a man's constitution."

The record contains the testimony of several other witnesses, apparently unbiased and disinterested in this controversy, tending to show that John S. Childress' mind at the date of the execution of the deed in question was sound; but the length of this opinion forbids its quotation. Enough has been stated, we think, to show that at least the great weight and preponderance of the testimony offered on the trial is against the verdict of the jury, and that the judgment of the trial court should be reversed. It is true that the disposition of our appellate courts is to uphold the verdicts of juries, and not to disturb them, if supported by any evidence; but, notwithstanding the uniformity of the decisions manifesting this disposition and tendency, we think that where, in the opinion of the appellate court, the great weight and preponderance of the testimony is against the finding of the jury, and is of such a character as to carry conviction that to uphold their verdict would be clearly wrong, the court should not hesitate to set it aside. That the courts not only have the right, but that it is their duty in such a case, to award a new trial, can hardly be denied. No witness who attacked by their testimony the mental capacity of John S. Childress seemed to be willing to declare that he was insane. They said that in their opinion he was of unsound mind at times; but they were not present at the time the deed was executed, and do not speak of his mental condition at that particular time. An analysis of their testimony discloses that their opinions were based very largely, if not almost wholly, upon the old age and bodily infirmities of the said Childress, from which they infer that at the very time the deed was executed he was of unsound mind. The rule, as we understand it, is that neither old age, sickness, nor distress in mind or body incapacitates, provided the testator or grantor has possession of his mental capacities, and understands the business in which he is engaged; that the test is integrity of the mind, and not the body.

Believing that the exercise of the right and the performance of the duty on the part of an appellate court, as above declared, is demanded in this case, the judgment of the court below is reversed, and cause remanded.

Reversed and remanded.