Fred O. GRIMES et al., Executors,
Appellants,

v.

Edgar MULRY et al., Appellees.

No. 3221.

Court of Civil Appeals of Texas.

Waco.

May 19, 1955.

Rehearing Denied June 9, 1955.

See, also, Tex.Civ.App., 280 S.W.2d 350.

344

Morrow & Martin, Hillsboro, Tarlton Morrow, Wright Morrow, Houston, for appellants.

Warwick H. Jenkins, Waxahachie, Stuart B. Lumpkins, Jerry E. Clarke, Hillsboro, for appellees.

HALE, Justice.

This appeal grew out of an application by appellants, Fred O. Grimes and his son, to probate the proposed will of W. R. Lacefield, deceased. Appellees, heirs at law of the deceased, contested the application on the grounds that the alleged testator did not have mental capacity to execute the will and that the execution thereof was induced by undue influence. The case was tried before a jury and resulted in a Special Issue verdict, whereby the jury found: (1) that the deceased did not have testamentary capacity, as defined in the court's charge, at the time he executed the will; and (2) that the making and execution of the will was procured by undue influence, as defined in the court's charge. Thereupon, the court rendered judgment denying the application of appellants to admit the will to probate.

The first point of error in the brief of appellants is as follows: "The finding of the jury in answer to Special Issue No. 1 that W. R. Lacefield did not possess testamentary capacity on April 6, 1953, is against the great and overwhelming weight and preponderance of the evidence, and insufficient to support the judgment of the trial court denying the probate of the will." By their second and third points, appellants say that "there is no evidence" and that "the evidence is wholly insufficient" to support the finding of the jury in answer to Special Issue No. 2 to the effect that the will was procured by undue influence. Although some of the evidence relevant to the issue of testamentary capacity may also have a material bearing upon the issue of undue influence, we shall discuss and pass upon appellants' first point of error before any consideration of their second and third points.

The alleged testator, W. R. Lacefield, was a bachelor 93 years of age at the time of his death on September 18, 1953. He was born and died in the State of Tennessee, but was a long-time resident of Hill County, Texas, where he lived on a farm consisting of 554 acres of land which he had owned for many years prior to his death. At the time of his death, he also owned his household goods, 34 head of cattle, and had $7,908.19 on deposit in three banks. Mr. Lacefield was a healthy, vigorous man until the last two or three years of his life. In January of 1953, he became seriously ill. During that month he was attended by Dr. Grant and was a patient in the Grant-Buie Clinic at Whitney, Texas. From January 25th, when he left the Grant-Buie Clinic, he was a patient in what is known as Catherine's Nursing Home in Hillsboro, Texas until February 8th. He then returned to his farm, and his neighbor, Jonah Wilson, moved with his family to Mr. Lacefield's farm in order to take care of him. On March 23rd, Mr. Lacefield was admitted as a patient to the Boyd Sanitarium in Hillsboro, where he remained under the care of Dr. Shirey until April 20th, when he again returned to Catherine's Nursing Home and later to his own home. He had no relatives living in Hill County, and, in August of 1953, he went back to Tennessee, where most of his relatives lived and where, as stated above, he died on September 18, 1953, in the home of his sister.

The proposed will was dated April 6, 1953. Appellants were therein appointed as executors and testamentary trustees of the estate of the deceased, with directions that no bond be required of them as such.

By the terms of the will, the testator devised and bequeathed all of his property to appellants as trustees for the uses and purposes therein set forth, which were substantially as follows: (a) the trustees were directed to divide all of testator's money, after the payment of his debts, among numerous persons therein named, and in the amounts specified, some of such persons being heirs at law of the deceased and others being friends in Hill County, the amounts ranging from $100 to $1,000, the total amount thereof aggregating $5,200; (b) the trustees were directed to buy a historic marker and pay for the same out of the money of the deceased, such marker to be of marble set in concrete near the entrance to the home of the deceased, and to bear the inscription: "W. R. Lacefield Estate. Purchased in his early life by W. R. Lacefield and constantly improved by him until his death. The earnings from this property have been willed by Mr. Lacefield to the benefit of Orphan Children and Religious and Charitable Institutions or causes. Erected by Fred O. Grimes and Fred O. Grimes, Jr., Trustees"; (c) the trustees were directed to distribute any balance of money remaining after making the above payments, to such orphans' homes and other religious and charitable organizations as they may select, the determination of such organizations and the amounts to be given to each being left to their discretion; (d) all of the balance of the property of the testator, including all of his real estate, was to be held and operated by appellants as executors and trustees in such manner as they might deem best, so long as either of them might live, "the net earnings therefrom to be divided ½ to such orphans' homes and religious and charitable institutions as may be selected by said executors and trustees, this matter being left to their discretion, but to include Methodist Orphans' Home, Waco and Files Valley Orphans' Home, the other ½ to be kept and delivered to my said executors and trustees as their compensation as such executors and trustees"; and (e) that upon the death of the survivor of the trustees therein appointed, all of the property of the deceased which had not been disposed of at that time should thereupon belong to and become the property of the Diocese of the Protestant Episcopal Church in which Hill County is located.

During the trial of the case approximately 20 witnesses, including Dr. Shirey and Dr. Boyd, were placed on the witness stand by appellants and 10 or more witnesses, including Dr. Grant, Mrs. Catherine Hodge, who operated Catherine's Nursing Home, and Jonah Wilson, were placed on the witness stand by appellees. The testimony of these various witnesses relates in large part to events which transpired from January of 1953 to the time of Mr. Lacefield's death, to matters and things which the witnesses observed and heard during that interval of time, and the opinions they formed with respect to whether Mr. Lacefield was or was not of unsound mind. Some of the witnesses testified that in their opinion he was of sound mind and others testified that in their opinion he was of unsound mind.

The trial court defined testamentary capacity in his charge to the jury as follows: "By the words 'testamentary capacity' is meant that the person making the will must, at the time the will is executed, have sufficient ability to understand the business in which he is engaged, and the effect of his acts in making the will, the capacity to know the objects of his bounty and their claims upon him, and the general nature of his property." In addition to the foregoing definition, the trial court submitted to the jury the following special charge requested by appellants: "In connection with the Court's definition of testamentary capacity, you are instructed that imperfect memory caused by sickness or old age, forgetfulness of names of persons the testator has known, idle questions or statements will not be sufficient to establish a lack of testamentary capacity, if the testator has sufficient intelligence remaining to understand the act he was performing, the objects of his bounty and the disposition he was making of his property." The record does not show that any objection was made to the court's

charge or that any request was made by either of the parties for an instructed verdict or for the rendition of a judgment non obstante veredicto.

In passing upon appellants' first point of error, it is the duty of this court to consider and weigh as best we can all of the competent evidence introduced upon the trial which tended to throw any light on the ultimate issue as to whether W. R. Lacefield did or did not have testamentary capacity as that term is defined above, on April 6, 1953. If it clearly appears from the record in its entirety that the finding of the jury in answer to Special Issue No. 1, to the effect that he did not possess testamentary capacity, is against the great weight and preponderance of the evidence as a whole to such extent as manifestly to be wrong and unjust, then the point should be sustained; otherwise, it should be overruled. Briscoe v. Bronaugh, 1 Tex. 326; Choate v. San Antonio & A. P. Ry. Co., 90 Tex. 82, 36 S.W. 247, 37 S.W. 319; Federal Underwriters Exchange v. Hinkle, Tex.Civ.App., 187 S.W.2d 122 (er. ref.); McLean v. McCollum, Tex.Civ.App., 209 S.W.2d 959 (er. ref.); In re King's Estate (King v. King), Tex.Sup., 244 S.W.2d 660.

As stated by the Supreme Court in the early case of Briscoe v. Bronaugh, 1 Tex. 326, supra, the law "has no scales wherein to weigh the different degrees of probability; still less to ascertain what weight of evidence shall amount to proof of any disputed fact. * * * The law, therefore, refers the weight of evidence and the different degrees of probability to the jury, who are to be guided in their decision by their conscientious judgment and the weight under all the circumstances of the case. And where the question is one of fact to be ascertained by the jury, from weighing the evidence and the degree of probability, the court will not interpose for the purpose of granting a new trial, unless it be in order to remedy some manifest error. * * * In such a case, it is not enough that it is not clear that the verdict is right, but it must clearly appear that it is wrong, to induce the court to set the verdict aside." The substance of these pronouncements has been applied repeatedly by the courts of this State in various types of cases. In addition to the cases cited above, see also: Missouri-Kansas-Texas R. Co. of Tex. v. Anderson, Tex.Civ.App., 258 S.W.2d 375, pts. 3 and 4 (er. ref. n. r. e), and authorities there cited.

Dr. Grant testified that he made an examination of Mr. Lacefield while the latter was a patient in the Grant-Buie Clinic at Whitney in January of 1953. He attempted to get a case history from the patient but it was not satisfactory "because of Mr. Lacefield's deafness and difficulty in getting through to him, and the difficulty of keeping him on one track." He made an electrocardiagram test of the patient's heart functions and found that he had arteriosclerosis in its fourth or last stage, with definite evidence of damage in the left ventricle. Arteriosclerosis in an advanced stage is a condition for which there is no known cure. It grows progressively worse, and usually results in loss of vitality, deterioration of most all physical processes the patient might have been capable of before its onset, and variable effects on his mentality, the patient being "usually able to recall incidents and what he did in 1880 or '88, and usually unable to state what he had for lunch or who visited him the day before." Dr. Grant testified that the difficulty which he encountered in attempting to keep the attention of the patient focused on one subject while taking his case history was characteristic of the effects of arteriosclerosis in an advanced stage. Dr. Grant also found the patient had serious prostatic trouble. His prostate gland had become so enlarged as to block the passage of urine from the kidneys and bladder, thereby causing irreparable damage to the kidneys and causing uremic poison to spread throughout his body. Seventy-two ounces of fluid was drained from the bladder of the patient. According to the testimony of Dr. Grant, uremia has a detrimental effect on the mental condition of a pa-

tient, in that it tends to cause sleeplessness and inattention, that is, inability to concentrate. The undisputed evidence from other witnesses shows that Mr. Lacefield was required to use a catheter in order to drain the urine from his bladder at all times after he became a patient in the Grant-Buie Clinic, until his death.

Mrs. Catherine Hodge, proprietress of Catherine's Nursing Home, is a registered nurse, having graduated in 1924 after the prescribed course of study for three years. At the time Mr. Lacefield entered her institution on January 25, 1953, she considered him to be a person of sound mind, although she described his condition as being that of a very sick man. With reference to his symptoms of uremic poison, Mrs. Hodge testified that the patient's feet were swollen to such extent that he was unable to wear shoes, and he had a skin rash extending over almost all of his body. When the patient returned to her institution on April 20th, she noted extensive deterioration from the condition which she had observed on January 25th. According to her testimony, the patient talked to himself, mumbled incoherently, failed to finish his sentences or to express any coherent thoughts, and "didn't talk with any sense." The patient did not know her and could not call her name until she would tell him who she was, although she would see him numerous times each day. She testified that she observed him signing checks prepared and presented to him by others without making any inquiry or examination. She stated that in her opinion the patient was of unsound mind.

Jonah Wilson testified that he was a close neighbor and friend of Mr. Lacefield for more than twelve years. He visited Mr. Lacefield in the Boyd Sanitarium on March 28th, April 3rd and April 10th. He testified, in substance, that on those occasions Mr. Lacefield was apparently unable to concentrate, broke off his statements in the middle of sentences, rambled in his conversation, could not answer questions about the farm work to be done, asked no questions about the work, paid little attention to checks which Wilson had made out for him to sign for work done on the farm, and would finally sign such checks without question or examination, which was contrary to Mr. Lacefield's usual business practice. He further testified that Mr. Lacefield spoke in a low, weak voice, and recognized the witness on each occasion only after he had identified himself, and then only after he had been in the presence of Mr. Lacefield for sometime. Based upon the observations which he detailed at great length, the witness testified that in his opinion Mr. Lacefield was mentally unstable.

The credibility of Dr. Grant, Mrs. Hodge and Jonah Wilson as witnesses, as well as the weight and degree of probability to be given to their testimony as above summarized, was fortified by testimony of other witnesses who, after stating facts in detail upon which their opinions were based, testified that they considered Mr. Lacefield to be of unsound mind.

On the other hand, Dr. Shirey and Dr. Boyd each testified that in their opinion Mr. Lacefield was of sound mind. The credibility and degree of weight and probability to be given to their testimony was fortified by the testimony of other witnesses who, after stating the facts upon which their opinions were based, testified that they considered Mr. Lacefield to be of sound mind. It should be noted, however, that Dr. Shirey did not claim to have made as comprehensive and detailed an examination of his patient as that which had been previously made by Dr. Grant. Dr. Boyd did not make any physical examination of the patient, but based his opinion upon his intimate acquaintance with Mr. Lacefield over a period of fifty-five years and the casual observations which he made of him while a patient in Boyd Sanitarium.

The testimony of numerous witnesses shows in effect that on the night of April 17th, while Mr. Lacefield was in the Boyd Sanitarium, he went into a state of frenzy, like unto that of a berserk, and remained in such state for six hours or more. During that interval of time, the patient

thought he saw snakes and suffered from a wide variety of delusions and hallucinations, including visions of hellfire and the damnation of lost souls. Dr. Shirey testified that he gave the patient heavy sedation, such as morphine and nembutal, in order to quiet him down and that, in his opinion, the violent condition of the patient was the result of an adverse reaction from the sedatives. However, he did not explain what brought about the condition of the patient which made it necessary to resort to heavy sedatives in the first instance.

Mr. Lacefield was a teetotaler all of his lifetime until he entered the Boyd Sanitarium, the evidence showing that he was prejudiced against the use of alcoholic beverages in any form. He was never a member of any church until after he entered the Boyd Sanitarium. The testimony indicates that he did not look with favor upon church membership. There is no evidence that he ever made a will prior to April 6, 1953, but there is evidence that as late as 1940 he had not done so. Shortly after entering the Boyd Sanitarium, he began to partake of wine, which was brought to the sanitarium by one of the appellants herein. On March 31st, while lying upon his bed in Boyd Sanitarium, the rector of St. Mary's Episcopal Church in Hillsboro administered to the patient the form of baptism in the Episcopal Church as contained in its Book of Common Prayer, in the presence of appellants. Dr. Shirey testified that he prescribed the use of wine for the patient in order to tone his appetite and build up his strength, and we have no doubt that the rector of St. Mary's Church acted in good faith when he baptized the patient. However, from all the evidence before us, we think reasonable minds could differ as to whether the patient took the wine before or after meals, and the amount of wine he consumed, as well as the conduct and motives of others than Dr. Shirey and the rector which influenced Mr. Lacefield to depart from his fixed convictions of a long life if, indeed, he had sufficient mental capacity to understand the import of the transactions in which he was engaged. Neither of the appellants was related by blood or marriage to the testator and neither testified at the trial.

In this case we have what appears on its face to be a most unnatural will purporting to have been made by a very old man at a time when he had been critically ill for more than two months from a combination of pathological conditions which could have reasonably caused progressive and rapid mental deterioration. After considering all the evidence introduced upon the trial, and weighing the same in the light of reason and conscience, we have concluded that the finding of the jury of testamentary incapacity on the part of Mr. Lacefield is not against the great weight and preponderance of the evidence as a whole to such extent as manifestly to be wrong or unjust, and, therefore, that such finding is sufficient, in contemplation of law, to support the judgment of the trial court denying the proposed will to probate. Consequently, we overrule appellants' first point of error. Morris v. Morris, Tex.Com.App., 279 S.W. 806; Galindo v. Garcia, Tex., 199 S.W.2d 499 and authorities; Montgomery v. Willbanks, Tex.Civ.App., 202 S.W.2d 851 (er. ref. n. r. e.); Birmingham v. Coleman, Tex.Civ.App., 241 S.W.2d 245 (er. ref. n. r. e.); Steinkamp v. Erwin, Tex.Civ. App., 249 S.W.2d 1012.

Since this court, in the exercise of its jurisdiction to pass finally on questions of fact, has decided that the evidence in this case is sufficient to support the finding of the jury to the effect that W. R. Lacefield did not possess testamentary capacity on April 6, 1953, it is unnecessary for us to discuss the second or third point in the brief of appellants because, under our prior holding, it becomes immaterial to a correct disposition of this appeal whether there is *any* evidence or, if so, *insufficient* evidence to support the finding of the jury on the issue of undue influence. In other words, even though we should hold there was no evidence, or find there was insufficient evidence of undue influence, neither such holding nor finding on our part would

require or justify a reversal of the judgment refusing to admit the will to probate.

The other points in the brief of appellants relate to alleged procedural errors. Complaint is made of three excerpts from the oral arguments of counsel for appellees to the jury, as follows: (1) "Now, gentlemen, Mr. Martin sought to read you the names of the beneficiaries of this will, but he didn't read far enough. Now, I'm going to read you some names. Here's the name of Mrs. Iva Bourland, a beneficiary in the will. Who is she? I'll tell you who she is. She is the secretary of Fred O. Grimes, who is one of the executors of this will"; (2) "Now, gentlemen of the jury, we're not contending that this is not a good will. It is well prepared and in fine legal form. What we are contending is that it is not Mr. Lacefield's will. Mr. Martin, I want to congratulate you on the beautiful will you have written"; and (3) "Billy Martin didn't have the guts to get on the stand and let us ask him some questions." We do not think any of these arguments constituted reversible error, for reasons which we shall note briefly.

The record discloses that counsel for appellants objected to the first excerpt from the argument which we have quoted, on the ground that there was no evidence that Mrs. Bourland was the secretary of Fred O. Grimes. Thereupon, counsel for appellees stated at once: "Gentlemen of the jury, I want to withdraw that remark" and the court promptly instructed the jury not to consider the same. The prejudicial effect, if any, of the remark of counsel was thereby minimized, if not completely removed.

The record is confusing as to whether any timely objection was made to the second or third excerpts from the argument which we have quoted above. The original bills of exception contained in the original transcript recite that such arguments were objected to on the ground that they were not justified by the evidence, and that the objections were overruled. But in a supplemental transcript, it is certified by the trial court that the original

bills of exception were prepared by counsel for appellants and approved by the court, pursuant to a local custom of the Hill County Bar Association whereby the court may, upon request, and in this case did, grant counsel a "full bill" on argument without requiring the grounds thereof to be stated.

Assuming, however, that timely objections were made on the grounds stated in the original bills of exception, and that such objections were overruled, we do not think the action of the court in either respect would require a reversal. It is readily apparent that the arguments were directed, primarily, to the issue of undue influence, it having been the contention of appellees in the court below that the making and execution of the will was procured by undue influence exerted on the testator by Mr. Grimes. The evidence showed that Hon. Wm. B. Martin represented appellants in the trial court and that he presented to Mr. Lacefield on April 6, 1953 the will which is the subject of this litigation. The record shows that immediately prior to the third excerpt which we have quoted, counsel for appellees had stated to the jury, in substance, that he did not know whether Fred Grimes was telling Mr. Lacefield what he ought to do about his property or "whether or not he was getting it fixed up so that he could hand it to him and say, 'You sign here.' I don't know, but I do know that there is a man in this court room who could tell you who gave him the information to put in that will. Who is it? There he sits. (Pointing at Wm. B. Martin) * * * If W. R. Lacefield had given him the facts that he put in that will, then Bill would have walked up to that witness stand and told you the facts; but Billy Martin didn't have the guts to get on the stand and let us ask him some questions. (Shaking his finger in Wm. B. Martin's face.)"

As a matter of fact, each of the arguments of which complaint is made related to the issue of undue influence, and we think the prejudicial effect thereof, if any, was limited to the answer of the jury

on the issue of undue influence. But, since the issue of undue influence has passed out of this case, it appears to us that the prejudicial effect, if any, of the arguments complained of has also passed out of the case.

Appellants further complain of the action of the trial court in permitting appellees to introduce certain evidence over their objections and in refusing to permit appellants to introduce further evidence while counsel for appellees was making their closing argument to the jury. We have considered the various contentions asserted under these complaints but we think they are without merit.

After careful inspection of the entire record, we are of the opinion that it does not disclose any reversible error in the trial of this case. Accordingly, all points of error upon which the appeal is predicated are overruled and the judgment of the court below is affirmed.