Ruby Summers WALLER et al., Appellants,

v.

A. O. SUMMERS et al., Appellees.

No. 6075.

Court of Civil Appeals of Texas.

Beaumont.

Jan. 24, 1957.

Rehearing Denied Feb. 21, 1957.

Brazil & Brazil, Lufkin, for appellants.

Musslewhite & Thompson, Lufkin, for appellees.

HIGHTOWER, Justice.

As succinctly stated in appellants' brief, this suit was brought by plaintiffs, A. O. Summers, et al., appellees, against Ruby Summers Waller, and husband, Jessie Waller, appellants, and Eugene Summers, all of whom were defendants, to cancel, on the ground of undue influence and mental incapacity, two deeds executed by T. A. Summers, deceased, hereinafter referred to as grantor, to Ruby Summers Waller and Eugene Summers, two of his children, and for the purpose of canceling a timber deed and for partition of the real and personal property of the estate of T. A. Summers, deceased. After both sides rested, plaintiffs dismissed their suit for cancellation of the timber deed and for partition of the personal property of T. A. Summers, deceased. The question of undue influence was not submitted to the jury. In answering two special issues submitted, the jury found that T. A. Summers, deceased, did not have sufficient mental capacity to execute two deeds to Ruby Summers Waller and Eugene Summers. The court rendered judgment setting aside and canceling said deeds, from which judgment Ruby Summers Waller and husband, Jessie Waller, alone, have prosecuted their appeal to this court.

Appellants have assigned thirty-one errors, the first four of which were briefed under these principles:

Point 1: That the evidence was insufficient * * *; Point 2: No credible evidence of probative force * * *; Point 3, that the verdict was so against the preponderance of the evidence as to be clearly wrong * * *; Point 4, that as a matter of law the verdict was wrong * * *. These points will be considered in common.

In accordance with the well-established principle that we must look to the evidence most favorable to the verdict, etc., we give the following summary of the testimony:

It appears undisputed that a few years prior to 1950, grantor suffered a blow over his head by a good size singletree, a consequence of which he remained in the hospital about 24 hours; that a few years later he suffered a serious carbuncle on the lower spine; that his wife died in 1949; that he suffered a stroke, probably a cerebral hemorrhage, in the latter part of '50, or the early part of '51, a result of which he was down several weeks; that he was thereafter rarely out of the house unaccompanied; that about October 5, 1954, he suffered a severe attack, the exact nature of which is disputed, for which he was hospitalized about a week; that he was thereafter rarely out of bed unaccompanied. About the 30th of January, 1955, he went back to the hospital, the second time, for about nine days, at which time he had another attack, and was released. He returned again about February 15th, where he died February 18, 1955, at the age of 81 years. At times material hereto

he had, and was treated for, high blood pressure; that shortly after his wife's death in 1949 he was found to be carrying around his farm, on his person in a tin can, the sum of $1,700. At such time he also carried $300 in his purse; that he was, thereupon, persuaded by his son, A. O. Summers, to put the money in a lock box in the Lufkin National Bank. That the signatures on the entrance card of this box reflected signatures of grantor, not executed by grantor, indicating that others than he frequented it and that it was not thought safe for him to be unaccompanied. After his first stroke he lived with his daughter and her husband, appellants herein, until his death aforesaid. The appellant, Ruby Summers Waller, was one of seven remaining children (one non compos mentis) and that the value of the property, under the deed in question, was approximately one-half of grantor's entire estate; that he had never evidenced favoritism among his children. There is no evidence of a will.

Mrs. Pauline Franklin, grantor's granddaughter, testified that after the singletree incident he often complained of serious headaches, and would often holler out at nights, "Don't do that! Oh, don't do that!" That his mind seemed to get weaker from the time of his first stroke; that thereafter he would have light spells and get worse at times. Once between his first and second attack he was taken on a picnic and, upon getting out of the car, just headed for the lake before he was stopped; that this didn't seem to her to be the right way to act; that he was always accompanied for fear of his safety; that after his second attack he talked as though he was out of his head—didn't make any sense; would frequently repeat himself and ask for something to eat after he had just eaten; that between his second and third visits to the hospital he just didn't have a mind that stayed with him long enough to make sense when he talked. His eyes had no expression; his mind became unsound and remained so, after his first stroke.

Mrs. A. O. Summers, daughter-in-law of grantor, testified thusly:

"Q. How did he act, and how did he talk after he had that stroke in the early part of '51 or the latter part of '50, Mrs. * * *? A. Well, I would say that Mr. Summers wasn't himself after he had the stroke, and he wasn't at himself after he got this lick, and he sure wasn't at himself after he got the stroke, had this stroke, because Mr. Summers was always a man that you could carry a conversation on with before all this happened, and you couldn't carry a conversation on with him afterwards.

"Q. He didn't talk coherently? A. He didn't talk right, no, sir, he didn't. He would get off and ask one question and then turn right around in a few minutes and ask the same question over.

"Q. When he would try to tell you anything, how did he talk about—I mean, how did he talk, and what was the nature * * *? A. Well, he would just tell it in a way that * * * it would be mingled up so, you wouldn't know hardly, when he got through, what he meant by it.

"Q. During all that time after he suffered that stroke, Mrs. Summers, do you think his mind was sound or unsound? A. I think it was unsound, Mr. Musslewhite.

"Q. You had a chance to watch him and talk to him? A. Yes, sir, I certainly did. I told my husband a lot of times that I thought they ought to, you know, do something more than what they were trying to do with Mr. Summers, because he wasn't, you know, capable of being by himself, and I offered to quit my job and bring him in our home. I work, and I offered to quit my job and bring him in our home and take care of him."

Thomas Nerren, grandson of grantor, testified that lots of times between his first

stroke and death, grantor would walk several steps before he acted like he had heard a question propounded to him; that he would then turn around, with no expression on his face, as though he had not heard; that many times grantor would feed his chickens after they had just been fed; that he couldn't follow a conversation through. That from the early part of '51 he would often imagine he had ticks on him and would ask his family to pick them off; that, in fact, he had none; that he talked incoherently; that from the time of his first stroke his mind was unsound, and, thereafter, continued to get worse.

Marshall Behealer testified that some four or five weeks before the execution of the deed in dispute, he tried to buy an acre of land from grantor and that the following conversation occurred with the appellants:

"Q. Just tell the jury what Mr. Waller told you about buying that tract of land from Mr. Summers? A. Well, they passed my house, or stopped out there, and I went to talk to them about something about the land—I had been up to Miss Ruby's house and talked to Mr. Summers up there about it some, and they stopped out there, and Mr. Waller told me I'd better know what I was doing to know whether that old man was capable of tending to his own business or not.

"Q. Was Mrs. Waller there with him at the time? A. Yes, sir.

"Q. Did she make any comment about that? A. None whatever.

"Q. In other words, she didn't say that he was capable after Mr. Waller made that statement to you? A. She never said a word.

"Q. And he told you that you had better know what you were doing, because he was afraid he wasn't capable of tending to his business? A. That's right."

He further testified that along about this time he had talked with grantor and it seemed like, "after some trouble he'd probably had, he seemed dull. He didn't seem at himself like he used to be."

In connection with the foregoing, it appears that in October of '54, grantor executed a deed to C. B. Brashear covering all of his pine timber of the diameter of six inches, six inches above the ground, for considerably less than its value; that he had always been very proud of it, having planted it in seedlings; that as a consequence of such deed the timber was cut down to "Christmas Trees"; that he was not in need financially.

Coursing strongly throughout the record, is the inference that appellants, together with the deed herein, obtained much more of the grantor's property, real and personal, than was natural, considering, particularly, that grantor had appeared to be very fond of all his children and the grandchildren by two of his deceased children.

Dr. Thames, witness of appellants, testified on cross-examination that he had treated grantor a few years before going into the army in April, '52. He stated that he had visited him once while home on leave, before his discharge in April, '54 when he again began treating him; that he had lost his medical record prior to '52; that he had treated him for high blood pressure and a seriously infected throat; that it possibly could have been a stroke that caused his death; that it could have been a stroke in '54, and that he seemed to recall a stroke in '51; that grantor was in a very poor mental and physical condition the last several weeks of his life; that he was very feeble after the first stroke and that he would not hazard a guess as to his mental condition August 27, 1952. He further testified that grantor was a very sick man and had to have assistance in walking; that his mind was childish; that he possibly could have had an infection of the meninges (layers of tissue encasing the spinal cord and brain) as a result of the carbuncle; that such an infection could

possibly have left some permanent injury to the central nervous system.

The remarks of Dr. Thames as to grantor's physical condition after 1954, and as to his mental condition the last few weeks of life, are significant in considering appellees' other witnesses on the subject.

Appellants' witnesses:

Dr. Thames, in addition, testified that it was his opinion that grantor died of a generally run-down condition and heart attack; that until his attack in '54 his mind was sound—as sound as it was before his first attack; that when he visited him between '52 and '53 his mind was sound; that when he stated he was "childish" he did not mean that, "he got down on the floor and played jacks."

Mr. C. E. Brazil testified that he had known grantor many years; had probated the will of grantor's wife in '51, and had drawn and acknowledged deeds of grantor's, including the one in dispute, on or about August 27, 1952. He stated that he had observed him carefully and knew his mind to be sound; that, in effect, at all times material hereto, he knew exactly what he was doing and talked rationally in every respect.

Mr. C. B. Brashear, called by appellees to establish the sale to him by grantor, of the timber hereinabove mentioned, testified on cross-examination: That he had dealt with grantor several years prior to 1950 and knew him well from then to his death; that he had bought the above mentioned timber in October of 1954; that at such time his mind was sound, as sound as it was since he first remembered.

Other witnesses for appellants were: Arnold Johnson, M. J. Halyard, William P. Junge; Jack Shelton and Willie Castleberry. These witnesses were emphatic, as were appellants' witnesses above-mentioned, that they had ample opportunity to observe grantor and that, at all times material hereto, his mind was sound.

In connection with appellants' third point, that the verdict is against the preponderance of the evidence, it is stressed that the verdict is supported only by the testimony of interested witnesses.

That appellees' witnesses, with the exception of Marshall Behealer, were interested there is little doubt. This was probably offset in the mind of the jury when they considered, as reflected by the record, that Dr. Thames was the son-in-law of C. E. Brazil, and a first cousin of Ward R. Burke, attorney, who was actively associated in the trial with Mr. Brazil;

That appellees' witness Arnold Johnson testified, on cross-examination, that grantor's mind was as good in his last illness as it was the first time he ever saw him in '32; that such statement was in direct conflict with Dr. Thames' statements as to the last illness;

That appellants' witness, M. J. Halyard, who testified that he was intimately acquainted with grantor at times relevant hereto, and that his mind was very sound, stated further that he was a close friend of appellants and certainly wanted to help them any way he could. That his testimony was in direct conflict with that of Dr. Thames as regard to grantor's mental and physical state in his last illness;

That Mr. William Prentiss Junge testified that he had long known grantor, and that his mind was sound. That he also testified in direct conflict to Dr. Thames, when he stated that grantor's mind was as good, a few days before his death, as it ever was; that he had grown up with appellant Ruby Summers Waller and was a close friend of appellants and that he would like to help them;

That Willie Castleberry, witness for appellants, testified that grantor's mind was sound up to a week of his death; that such testimony regarding his last illness was in direct conflict with that of Dr. Thames;

That C. B. Brashear, called by appellees to establish the sale to him by grantor, of

the above mentioned timber, would have been testifying against the validity of his own timber deed of October 14, 1954, had he not stated, upon cross-examination, that grantor's mind was sound at times material here, and, certainly, at the very time of his own deed.

Appellants have forcefully submitted the authority of Cardinal v. Cardinal, Tex.Civ. App., 131 S.W.2d 1005; Wilson v. Humble Oil & Refining Co., Tex.Civ.App., 82 S.W. 2d 1095; Ramirez v. Sanchez, Tex.Civ.App., 97 S.W.2d 1034; Crow v. Childress, Tex. Civ.App., 169 S.W. 927, and other cases of like import, but in each we fail to find justification for reversal of the case at bar and appellants' first four points are accordingly overruled. Polser v. Polser, Tex.Civ. App., 179 S.W.2d 542; Grimes v. Mulry, Tex.Civ.App., 280 S.W.2d 343; Klindworth v. O'Connor, Tex.Civ.App., 240 S.W.2d 470; Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696; Woods v. Townsend, 144 Tex. 594, 192 S.W.2d 884; Galindo v. Garcia, Tex., 199 S.W.2d 499.

By their fifth point appellants complain of the trial court's refusal to withdraw from the jury all evidence introduced for the purpose of attempting to secure an accounting and partitioning of the property of the estate of T. A. Summers, deceased, after the appellees dismissed their cause of action for partition of such property. This was a blanket motion and failed, in any manner, to specify such evidence as was erroneous and so failed to apprise the trial court of that which should be withdrawn. Much of the evidence, thus alluded to, was proper on the question of mental capacity. Appellants' fifth point is accordingly overruled.

By their sixth point, appellants complain that counsel for appellees, in his closing argument, commented on the failure of appellants to testify when they were barred therefrom under Article 3716, R.C.S. More specifically, in connection with such sixth point, appellants complain of counsel

for appellees referring extensively to that portion of Marshall Behealer's testimony, as set out supra, 299 S.W.2d 755. In such connection, counsel for appellees stated to the jury that appellant Ruby Summers Waller was there in the presence of her husband Jessie Waller, and witness Behealer at the time of such colloquy, and that she did not deny that grantor did not know what he was doing, or was not capable of tending to his business; and that, therefore, the jury had the right to assume that she agreed with what Jessie Waller said; that she could have gotten up, and should have gotten up right then, and denied the truth of what her husband had said, if it were not so.

It is not to be found anywhere in this argument that counsel even intimated that appellant Ruby Summers Waller should take the stand and testify in contravention of Article 3716, R.C.S. On the contrary, its sole effect was to call the attention of the jury to the fact that appellant could have, had she so desired, taken the witness stand and denied that the transaction had ever occurred; that if it had occurred she did not hear it, that if she did hear it, she then and there refuted the statement. Certainly this would have been permissible. Appellants' sixth point is, therefore, overruled.

Appellants' seventh point contends that the jury used in the trial of the case was not drawn from the jury wheel as required by law. In such connection is to be noted the following agreed statement between appellants and appellees: "Although it was known by defendants and their attorneys before their announcement of ready for trial that the jury panel was selected by jury commissioners rather than a jury wheel, no motion to quash the jury panel was filed by defendants before their announcement of ready for trial, and the complaint of defendants concerning the invalidity of the jury panel was raised by defendants for the first time in their Amended Motion for new trial." It ap-

pears that, as reflected by their agreement, appellants waived any right they had under the seventh point and cannot now complain. The seventh point is overruled. St. Louis Southwestern R. Co. of Texas v. York, Tex.Civ.App., 252 S.W. 890 and Houston Electric Co. v. Seegar, 54 Tex.Civ.App. 255, 117 S.W. 900.

All other assignments having been abandoned in appellants' brief, the judgment of the trial court is accordingly affirmed.

## On Motion for Rehearing

We have herein considered the ten points of error as presented by appellants' first motion for rehearing and have determined that they cannot be sustained.

Appellants have respectfully requested that we reconsider our previous opinion that the trial court did not commit error as raised by the fifth point in their brief, which point reads as follows:

"The Court erred in refusing to withdraw from the jury *all evidence* introduced for the purpose of attempting to secure an accounting and partitioning of the property of the estate of T. A. Summers, deceased, after the appellees dismissed their cause of action for partition of such property."

Examining again appellants' motion, as presented to the trial court at the conclusion of all the evidence, requesting the withdrawal from the jury of the evidence in question, we find the following to be relevant:

"The defendants  *  *  *  request the Court to withdraw from the consideration of the jury *any testimony* regarding *any sale* of timber by T. A. Summers and the receipt of *any monies* therefrom, and *any testimony* regarding the *value of the land and timber* described in *any* of plaintiffs' pleadings  *  *  *  *the evidence regarding any personal property,* the testimony regarding the value of the land, and particularly, the evidence of the witness Jack Nerren." (Italics ours.) The motion concluded with the request that the trial court withdraw from the jury *all the foregoing evidence.* (Italics ours.)

Appellants' fifth point, and their assignments of error in their motion for new trial, was necessarily predicated on, and restricted to, the foregoing motion, and in view of our opinion that much of this evidence, along with evidence of much other personal property not specified in such motion, was proper on the question of mental capacity, we again conclude the same to have been a blanket motion which failed to properly specify such evidence as was erroneous so as to thereby apprise the trial court of that which should have been withdrawn, and that such motion was, therefore, properly refused. It is also noteworthy that appellants' fifth point, as above stated, complains only of the court's failure to withdraw *all evidence* therein alluded to. The following are authorities that, under these circumstances, where much evidence is introduced, some of which may be admissible, and some inadmissible, the objecting party must specify that portion of the whole which is sought to be withdrawn as inadmissible. Texas Pipeline Co. v. Ennis, Tex.Civ.App., 44 S.W.2d 773; Federal Crude Oil Co. v. Yount-Lee Oil Co., Tex. Civ.App., 73 S.W.2d 969, 981; Texas Employers Ins. Ass'n v. Neatherlin, Tex.Civ. App., 31 S.W.2d 673.

Having, therefore, requested the trial court to withdraw all the evidence relating to the counts in partition and accounting, the motion was properly refused, and, consequently, we adhere to our original opinion that the resultant inference, to the effect that appellants obtained much more of T. A. Summers' property, real and personal, than was natural was properly before the jury. The following authorities, submitted by appellants, are not considered to be in point as the facts here exist: Bain Peanut Co. of Texas v. Pinson, Tex. Com.App., 294 S.W. 536; Floyd v. Fidelity nion Casualty Co., Tex.Com.App., 39 S.W. 2d 1091; Jones v. Jones, Tex.Civ.App., 82 S.W.2d 1035.

Appellants' assignments of error, 1 through 5, and assignment 10, are by the

foregoing reasoning and authorities overruled. Assignments 6 through 9, having been previously determined, compel adherence to our original opinion, except, that it may be added, in deference to appellants' misapprehension to the contrary, that our original opinion places little emphasis on the last illnesses of T. A. Summers, as testified to by appellants' witnesses, except as such testimony might have affected such witnesses' credibility before the jury.

■ Contained in the motion to withdraw, was also the request that defendants below be given more time to properly specify such evidence therein alluded to as was thought inadmissible, and the further request, in the alternative, that the court limit such evidence solely to the issue on mental capacity. These requests were by the court refused. Defendants have failed to assign such refusals in their motion for new trial and, as a result thereof, as appellants herein, they were unable to predicate points of error thereon, and consequently we may not consider their arguments in relation thereto.

The motion for rehearing is refused.